[No. S036269. Sept. 28, 1995.]

SANTA CLARA COUNTY LOCAL TRANSPORTATION AUTHORITY,
Petitioner, v.
CARL GUARDINO, as Auditor-Controller, etc., Respondent;
HOWARD JARVIS TAXPAYERS' ASSOCIATION et al., Real Parties in
Interest.

## COUNSEL

Andrew L. Faber, Berliner Cohen, Nossaman, Guthner, Knox & Elliott, Alvin S. Kaufer and Winfield D. Wilson for Petitioner.

Larry W. Kreig, Debra A. Greenfield, Orrick, Herrington & Sutcliffe, Mary A. Collins, Lynne T. Hirata, Robert K. Innes, Lempres & Wulfsberg, H. James Wulfsberg, Mark A. Stump, Hanson, Bridgett, Marcus, Vlahos & Rudy, David J. Miller, Ray E. McDevitt, Susan B. Laitin, Kennedy & Wasserman, R. Zachary Wasserman, Bertha A. Ontiveros, Francis F. Chin, Christopher M. Micheli, Lester W. Schiefelbein, John R. Masterman, Fred L. Main, D. Craig Nordlund, Denise LaChance, Peter M. Greenwald, Barbara Baird, Remcho, Johansen, & Purcell, Robin B. Johansen, Charles C. Marson and Wendy S. Strimling as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Jonathan Mark Coupal, Timothy J. Morgan, Kaplanis & Grimm, Trevor A. Grimm, Bell & Hiltachk, Bell, McAndrews & Hiltachk and Thomas W. Hiltachk for Real Parties in Interest.

Ronald A. Zumbrun, Anthony T. Caso and Alan W. Foutz as Amici Curiae on behalf of Real Parties in Interest.

Steven N. Skolnik, City Attorney (Huntington Park and Santa Fe Springs), as Amicus Curiae.

## OPINION

**MOSK, J.**—A local agency proposed a sales tax to fund certain transportation projects, and the tax was approved by a majority but less than two-thirds

of the electors voting on it. The agency filed this original proceeding in the Court of Appeal for a writ of mandate to validate the tax, contending the tax does not violate either (1) the requirement of a two-thirds voter approval imposed by Government Code section 53722, a provision of Proposition 62, a statutory initiative adopted at the 1986 General Election, or (2) the requirement of a two-thirds voter approval imposed by section 4 of article XIII A of the California Constitution, a provision of Proposition 13, a constitutional initiative adopted at the 1978 Primary Election. In a divided opinion the Court of Appeal held the tax invalid under Proposition 13 and denied the writ. As will appear, we conclude that the tax is invalid under Proposition 62 and that the judgment of the Court of Appeal denying the writ should be affirmed on that ground.

## FACTS

In 1987 the Legislature enacted the Local Transportation Authority and Improvement Act (hereafter the Act). (Pub. Util. Code, §§ 180000-180264.) The Act declared that "federal and state funding . . . is inadequate" to meet local transportation needs, and proposed a scheme to "raise additional local revenues" for the maintenance and improvement of local streets, highways, and mass transit systems. (*Id.*, § 180001, subds. (c) and (d).) To this end, the Act authorized the board of supervisors of any county to create a "local transportation authority" composed of elected officials of local governmental agencies. (*Id.*, § 180051.)[1] The Act then empowered each such authority to adopt an ordinance imposing a retail transactions and use tax—i.e., a sales tax—on a countywide basis at a rate not to exceed 1 percent, provided the ordinance is submitted to the voters and approved by a majority of those voting. (*Id.*, § 180201.) The Act further required the authority to adopt a "county transportation expenditure plan" approved by the board of supervisors and a majority of the city councils of the county. (*Id.*, § 180206.) Finally, the Act empowered the authority, for the purpose of financing any planned capital expenditures, to issue revenue bonds payable from the proceeds of the tax, provided the voters also approved the issuance of such bonds. (*Id.*, § 180250.)

In June 1992, pursuant to this legislation, the Board of Supervisors of Santa Clara County created the Santa Clara Local Transportation Authority. In July 1992 that authority adopted an ordinance imposing a countywide sales tax at the rate of one-half of 1 percent for 20 years beginning on April 1, 1995. The ordinance further empowered the transportation authority to

---

[1] In the alternative, the board of supervisors could designate an existing local transportation agency as such an authority. (Pub. Util. Code, § 180050.)

issue bonds payable from the revenues from this tax, and declared that such revenues and the bond proceeds could be used only for the projects described in the county transportation expenditure plan.

The board of supervisors then placed the ordinance on the November 1992 General Election Ballot as Measure A. It received an affirmative vote of 54.1 percent, i.e., more than a majority but less than two-thirds of those voting.

Following the election, a number of nonprofit organizations and individuals opposed to Measure A filed an action in the Santa Clara Superior Court challenging the tax as violative of both Proposition 13 and Proposition 62.

In January 1993 the transportation authority adopted a resolution for the issuance of $275 million in bonds (revenue notes) payable out of its anticipated revenues from this tax, and directed its auditor-controller, Carl Guardino, to sign the bonds. (See Pub. Util. Code, § 180257.) Guardino refused to do so unless and until the tax was determined to be valid. The transportation authority (hereafter petitioner) then filed a petition for writ of mandate in the Court of Appeal in the first instance, contending the tax is not in violation of either Proposition 13 or Proposition 62. The petition named Guardino as respondent and named the plaintiffs in the pending superior court action as real parties in interest, and prayed for a writ compelling Guardino to sign the bonds.

The Court of Appeal exercised its original jurisdiction over the petition (Cal. Const., art. VI, § 10), held the tax invalid under Proposition 13, and denied the writ.[2] We granted review.

## I

As it did in the Court of Appeal, petitioner now contends the challenged tax is not invalidated by either Government Code section 53722[3] or section 4 of article XIII A of the California Constitution. A holding that the tax violates the constitutional provision, of course, would be dispositive of this proceeding. (See, e.g., *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2

---

[2]We note that although the Court of Appeal set the matter for oral argument and filed a written opinion in the case, it did so without issuing either an alternative writ or an order to show cause. Some three years earlier we explained in detail why this procedure was improper and directed that "in the future all Courts of Appeal should follow the contemplated statutory procedure [see Code Civ. Proc., §§ 1085, 1087, 1088] by issuing an alternative writ or order to show cause before setting a writ matter for oral argument." (*Bay Development, Ltd.* v. *Superior Court* (1990) 50 Cal.3d 1012, 1025, fn. 8 [269 Cal.Rptr. 720, 791 P.2d 290].) We reiterate that directive today.

[3]All unlabelled code references hereafter are to the Government Code.

Cal.Rptr.2d 490, 820 P.2d 1000] (hereafter *Rider*).) But the same would be true of a holding that the tax violates section 53722: in either event respondent would be under no duty to sign the bonds and the petition to compel him to do so would be without merit, as the Court of Appeal held. When a similar local sales tax was challenged on the same two constitutional and statutory grounds in *Rider*, this court chose to address only the constitutional ground and held the tax invalid under Proposition 13. (1 Cal.4th at pp. 10-15.) The majority opinion in *Rider*, however, expressly left the statutory ground open (*id.* at p. 15); and the concurring opinion of Justice George, joined by Justice Panelli, discussed the merits of that ground at some length, concluding that the tax was also invalid under section 53722 and that section 53722 was constitutional (1 Cal.4th at pp. 17-24).

Nevertheless, the constitutionality of section 53722 remains in doubt. In *City of Westminster* v. *County of Orange* (1988) 204 Cal.App.3d 623 [251 Cal.Rptr. 511], the Court of Appeal held unconstitutional a section of Proposition 62 (§ 53727, subd. (b)) that requires majority voter approval of any local taxes imposed during a 16-month "window period" preceding the effective date of the proposition. And in *City of Woodlake* v. *Logan* (1991) 230 Cal.App.3d 1058 [282 Cal.Rptr. 27], the Court of Appeal held unconstitutional three more sections of Proposition 62: viz., section 53723, a closely related provision that requires majority voter approval of all new general taxes, and two procedural provisions implementing that requirement (§§ 53724, 53728).

These holdings inevitably cast a cloud over the constitutionality of section 53722, because the two procedural provisions just cited (§§ 53724, 53728) also govern section 53722, and the defects found in all three provisions of Proposition 62 invalidated in *City of Woodlake* v. *Logan, supra*, 230 Cal.App.3d 1058, are defects that petitioner now contends invalidate section 53722. Indeed, although the majority Court of Appeal opinion in this case did not reach the question, the dissenting opinion discussed it in detail and concluded that section 53722 is unconstitutional for the very reason that *Woodlake*'s "analysis and conclusion apply with equal force to the voter approval requirement in section 53722."

These circumstances call for a prompt resolution of the issue by this court. In the nine years since Proposition 62 was adopted, the Legislature has enacted numerous statutes like the Act in issue here (Pub. Util. Code, §§ 180000-180264) purporting to authorize local governmental entities to impose taxes with the approval of less than two-thirds of the voters, and local entities like petitioner have relied on those statutes. Accordingly, in its

brief on the merits petitioner expressly "requests this Court to enter a definitive ruling on Proposition 62. Local governments issue bonds secured by taxes and, until this Court rules on the constitutionality of Proposition 62, there is a cloud hanging over those bonds. That cloud adds an element of risk which, obviously, compels investors to demand higher interest to compensate for the risk." A higher cost of money, of course, results in increased expense to the local agency and ultimately to the public. Equally important, the question is ripe for decision: the parties have raised the issue of the constitutionality of section 53722 at every stage of this proceeding, and it is fully briefed. To decide the issue at this time will thus serve the policy of "resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question." (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] [ripeness doctrine].)

For all these reasons we begin by addressing petitioner's contention that its tax is not invalidated by section 53722.[4] ■ As urged by Justice George in his concurring opinion in *Rider, supra,* 1 Cal.4th at page 17, this approach is also consistent with the " 'well-established principle that this Court will not decide constitutional questions where other grounds are available and dispositive of the issues of the case.' " (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 66 [195 P.2d 1], quoting from *Hurd* v. *Hodge* (1948) 334 U.S. 24, 30, fn. 6 [92 L.Ed. 1187, 1192, 68 S.Ct. 847]; accord, *Cumero* v. *Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586 [262 Cal.Rptr. 46, 778 P.2d 174]; *In re Michael G.* (1988) 44 Cal.3d 283, 295 [243 Cal.Rptr. 224, 747 P.2d 1152]; *People* v. *Green* (1980) 27 Cal.3d 1, 50 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].) That principle is itself an application of the larger concept of judicial self-restraint, succinctly stated in the rule that "we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (*People* v. *Williams, supra,* 16 Cal.3d 663, 667; accord, *In re Michael G., supra,* 44 Cal.3d 283, 295; *People* v. *Marsh* (1984) 36 Cal.3d 134, 144 [202 Cal.Rptr. 92, 679 P.2d 1033]; *People* v. *Green, supra,* 27 Cal.3d 1, 50; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 484-485 [82 Cal.Rptr. 724, 462 P.2d 580].) As the United States Supreme Court reiterated, "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (*Lyng* v.

---

[4]For the same reasons we do not remand this question to the Court of Appeal for its initial determination (see, e.g., *Rider, supra,* 1 Cal.4th at pp. 15-16), but exercise our discretion to decide the issue in this proceeding. (Cal. Rules of Court, rule 29.2(a).)

*Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445 [99 L.Ed.2d 534, 544, 108 S.Ct. 1319].) Applying that principle, the high court observed that if statutory relief had been adequate in the case before it, "a constitutional decision would have been unnecessary and therefore inappropriate." (*Id.* at p. 446 [99 L.Ed.2d at p. 544].) Here, as we shall see, the statutory ground is adequate and therefore dispositive.

II

As noted at the outset, Proposition 62 is a statutory initiative adopted by the voters at the 1986 General Election. It added a new article to the Government Code (§§ 53720-53730) requiring that all new local taxes be approved by a vote of the local electorate.[5]

Section 53722, a key provision of the scheme, provides: "No local government or *district* may impose any *special tax* unless and until such special tax is submitted to the electorate of the local government, or district and approved by *a two-thirds vote* of the voters voting in an election on the issue." (Italics added.) ▪ It is undisputed that the tax in issue here was not approved by a two-thirds vote. On its face, therefore, section 53722 invalidates the tax if petitioner is a "district" within the meaning of the statute and if the tax is a "special tax" within that meaning.

To understand the quoted terms of Proposition 62 it will be helpful to begin by reviewing a portion of Proposition 13 and the case law construing it. The relevant portion of Proposition 13, now found in section 4 of article XIII A of the Constitution (hereafter article XIII A, section 4), states that "Cities, Counties and *special districts*, by a two-thirds vote of the qualified electors of such district, may impose *special taxes* on such district," except real property taxes. (Italics added.) Proposition 13 does not define either of the emphasized terms.

The term "special tax" as used in Proposition 13 was first construed by this court in *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935] (*Farrell*). At issue was a payroll and gross receipts tax imposed by the City and County of San Francisco; the proceeds of the tax were placed in the city's general fund and used for general revenue purposes. In 1980, two years after Proposition 13 took effect, the local electorate approved an extension of an increase in the tax by a simple majority vote. We held that the tax was not subject to the two-thirds voter approval requirement of Proposition 13 because we construed the term

---

[5]The text of Proposition 62 is reprinted in full as an appendix hereto.

"special taxes" as used in that measure to mean "taxes which are levied for a special purpose rather than, as in the present case, a levy placed in the general fund to be utilized for general governmental purposes." (32 Cal.3d at p. 57.)

We returned to this question in *Rider, supra*, 1 Cal.4th 1. At issue was a sales tax imposed by the San Diego County Regional Justice Facility Financing Agency for the purpose of financing the construction and operation of criminal detention and courthouse facilities in the county. In 1988 the local electorate approved the tax by a simple majority vote. A majority of this court, however, held that the tax was subject to the two-thirds voter approval requirement of Proposition 13 because the agency was a "special district" and the tax was a "special tax." On the latter issue the agency argued that the tax was a "general tax" because its proceeds were not earmarked for any special purpose within the agency but would be used for the agency's "general governmental purposes," i.e., to fund *all* the activities of the agency in carrying out its mandate to construct and operate the county's justice facilities. This court rejected the argument and construed the term "special tax" as used in Proposition 13 to mean a tax "levied to fund a specific governmental project or program, such as the construction and financing of the County's justice facilities" (1 Cal.4th at p. 15), i.e., even when that project is the agency's only *raison d'être*.

Proposition 62 defines "special" and "general" taxes in the terms we used in *Farrell, supra*, 32 Cal.3d at page 57: section 53721 provides that "All taxes are either special taxes or general taxes. General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes." Yet the case at bar is virtually identical to *Rider* with respect to the narrowness of the *purpose* of the tax before us: the Legislature declared its intent that the tax be imposed for the specific purpose of funding "local transportation maintenance and improvement needs" (Pub. Util. Code, § 180001, subd. (c)) and that the proceeds of the tax be specifically allocated to the construction, improvement, and operation of local transportation facilities (*id.*, § 180205). In these circumstances petitioner correctly conceded in its opening brief that "The tax in question . . . is a 'special tax' as defined by this Court in *Rider*."[6] The measure is therefore a "special tax" within the meaning of section 53722.

---

[6]At oral argument petitioner changed its position and urged that the measure is a "general tax" because it funds all the activities that petitioner is authorized to perform. We need not consider points raised for the first time at oral argument (*In re Sixto* (1989) 48 Cal.3d 1247, 1263, fn. 2 [259 Cal.Rptr. 491, 774 P.2d 164]), and in any event the contention is untenable under the rule of *Rider, supra*, 1 Cal.4th at page 15 (see also *id.* at p. 19, fn. 2 (conc. opn. of George, J.) [applying *Rider* rule to Proposition 62]).

Petitioner vigorously contends, however, that it is not a "district" to which section 53722 applies. In *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205-208 [182 Cal.Rptr. 324, 643 P.2d 941] (*Richmond*), we construed the term "special district" as used in Proposition 13 (i.e., art. XIII A, § 4) to mean only districts that are authorized to levy a property tax. Petitioner, which is not authorized to levy a property tax, contends that in adopting Proposition 62 the voters intended to adopt the *Richmond* construction of "special district" in Proposition 13 as the meaning of "district" in section 53722. The contention is without merit.

We begin by observing that on its face Proposition 62 applies not just to "special districts"—a term it does not use—but to any "district"—the term it uses throughout its text. Because the drafters of Proposition 62 were well aware of the wording of Proposition 13—the same tax reform advocates authored both measures—we must infer that their decision to use the unqualified and therefore broader term "district" was deliberate. Moreover, because the drafters of Proposition 62 were equally well aware of our construction of the narrower term "special district" in *Richmond*—limiting it even further to districts authorized to levy property taxes—we find it significant that they did *not* incorporate that construction into the basic definitional provision of Proposition 62—section 53720, the opening section of the proposition. On the contrary—and most significant of all—when the drafters did choose the definition of "district" that would govern all sections of Proposition 62, including therefore section 53722, they reached back to a broad statutory definition that had long predated Proposition 13 (and hence *Richmond*), viz., " 'district' means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." (§ 53720, subd. (b).)[7] When we give the quoted words of the statute their plain meaning, as we must, we cannot doubt that petitioner fits the definition: petitioner is an agency of the state formed pursuant to general law (Pub. Util. Code, § 180000 et seq.) for the local performance of a governmental function (raising tax revenues) within limited boundaries (Santa Clara County). On the face of the statute, therefore, petitioner is a district within the meaning of section 53722.

Despite the settled rule that when statutory language is plain and unambiguous there is no need for construction and courts should not indulge in it

---

[7]For example, a dozen years before Proposition 13 was adopted the Revenue and Taxation Code provided, in language identical to section 53720, that " 'district' means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." (Rev. & Tax. Code, § 2131, subd. (b), added by Stats. 1966, 1st Ex. Sess., ch. 115, § 4, p. 591.) The definition is a common one, found in more than two dozen of our statutes and applying to a wide variety of local governmental agencies.

(e.g., *Rossi* v. *Brown* (1995) 9 Cal.4th 688, 694-695 [38 Cal.Rptr.2d 363, 889 P.2d 557]; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148]), petitioner presses its claim that we should construe the term "district" in section 53722 to mean only districts authorized to levy a property tax. Petitioner advances several arguments in support of this view, but none is convincing.

First, petitioner relies on a difference in wording between section 53722 and section 53723, which is the section of Proposition 62 requiring that new *general* taxes be approved by a *majority* of the electors. Section 53723 provides that no district, "whether or not authorized to levy a property tax," may impose a general tax without such approval, while section 53722—as we have seen—does not include the quoted phrase. Reading the two sections together, petitioner infers from this difference in wording that section 53723 applies to all districts, including those "not authorized to levy a property tax," and therefore that section 53722 does *not* apply to districts that are not thus authorized, including petitioner. Any other interpretation, petitioner concludes, would render the quoted phrase surplusage in violation of the rule of construction that each word or phrase in a statute should be given some meaning and surplusage avoided. (E.g., *Farrell, supra,* 32 Cal.3d at p. 54.)

The argument is unpersuasive on several grounds. To begin with, its logic is deficient. Section 53723 provides, "No . . . district, *whether or not* authorized to levy a property tax . . . ." (Italics added.) Petitioner reads this language as if it said, "No district, *even if it is not* authorized to levy a property tax . . . ." But as a matter of logic it could equally well be read to say, "No district, *even if it is* authorized to levy a property tax . . . ." In that event the rule against surplusage would lead to the conclusion that section 53722 does not apply to districts that *are* authorized to levy a property tax, and therefore does apply to districts that are *not* thus authorized, including petitioner. Any argument that can be used to prove two contrary propositions, of course, is logically unsound.[8]

■ The rule of construction that petitioner invokes, moreover, is not absolute; like all such rules, the rule against surplusage will be applied only

---

[8]Viewed another way, petitioner's argument assumes its own conclusion. Petitioner's unstated premise is that the quoted phrase of section 53723 ("whether or not authorized . . .") makes sense only if we assume that the drafters of Proposition 62 intended section 53722 to apply only to districts (unlike petitioner) that are authorized to levy a property tax. But if we assume arguendo the exact opposite, i.e., that section 53722 was intended to apply only to districts (like petitioner) that are *not* authorized to levy a property tax, it would still have made sense for the drafters to provide that section 53723 applies to all districts "whether or not authorized to levy a property tax." Again the quoted phrase supports either assumption equally well.

if it results in a *reasonable* reading of the legislation. (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 459 [279 Cal.Rptr. 834, 807 P.2d 1063] [the rule applies "Where reasonably possible"]; *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 114 [172 Cal.Rptr. 194, 624 P.2d 244] [same].) "When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165-1166 [278 Cal.Rptr. 614, 805 P.2d 873]; accord, *Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 343-344 [250 Cal.Rptr. 268, 758 P.2d 596].)

The inference that petitioner draws from the difference in wording between section 53722 and section 53723 is unreasonable in several respects. To begin with, if the drafters of Proposition 62 had intended that the statute prescribing the two-thirds voter approval requirement for special taxes imposed by districts (i.e., § 53722) apply only to districts authorized to levy property taxes, they would logically have expressed that intent directly *in the special-tax statute itself*, rather than leave the matter to be deduced by negative implication from an interpolated phrase in a different statute on another subject—i.e., the majority voter approval requirement for general taxes (§ 53723).

In any event, on this question we agree with Justice Holmes that "a page of history is worth a volume of logic." (*New York Trust Co.* v. *Eisner* (1921) 256 U.S. 345, 349 [65 L.Ed. 963, 983, 41 S.Ct. 506, 16 A.L.R. 660].) ■ The manifest purpose of Proposition 62 as a whole was to increase the control of the citizenry over local taxation by requiring voter approval of all new local taxes imposed by all local governmental entities: the measure defines broadly and inclusively both the taxes (§ 53721) and the entities (§ 53720) to which it applies. As the drafters well knew, the result of the decision in *Richmond, supra,* 31 Cal.3d 197, was to free districts without property taxing power from the requirement of Proposition 13 that new special taxes be approved by the voters. But the sole issue in *Richmond* was the construction of the relevant language that Proposition 13 added to the Constitution (art. XIII A, § 4); nothing in the decision prohibited imposing the same voter approval requirement on the same districts by legislative means. Given the evident intent of the drafters of Proposition 62 to close by legislation what they perceived were court-made "loopholes" in Proposition 13, it is unreasonable to believe they would have chosen to leave the *Richmond* "loophole" open and instead addressed only the issue whether to

impose a voter approval requirement on general taxes levied by districts without property taxing power—an issue that had never arisen in the cases construing Proposition 13.

 Finally, although petitioner purports merely to seek an exception from the facial scope of Proposition 62 for a single class of districts—those not authorized to levy property taxes—in reality the exception would swallow the rule. As the drafters also must have known, essentially *no* district formed after the adoption of Proposition 13 has the power to levy a property tax; with very limited exceptions, only counties have that power. (Rev. & Tax. Code, § 93, subds. (a), (b); *Rider, supra,* 1 Cal.4th at p. 11.) It follows that under petitioner's reading of section 53722 the statute would assertedly be meant to apply only to districts with the authority to levy property taxes *even though there are, in effect, no districts with that authority.* We cannot ascribe so unreasonable and self-defeating an intent to the drafters of Proposition 62 and the voters who adopted it.

For all these reasons we conclude that the rule against surplusage must give way in this case to the plain meaning of the provision of Proposition 62 (§ 53720, subd. (b)) that defines "district" in section 53722 to encompass all districts within the terms of the statute, including therefore districts without property taxing power.[9]

Petitioner also invokes the rule of construction that when legislation has been judicially construed and a later statute on the same or an analogous subject is framed in identical or substantially similar words, the courts will ordinarily presume the Legislature intended the later statute to receive a like construction. (See, e.g., *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 557 [147 Cal.Rptr. 165, 580 P.2d 665]; *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1993) 19 Cal.App.4th 1645, 1650 [24 Cal.Rptr.2d 67].) Petitioner asserts that the wording of section 53722 is "substantially similar" to that of the provision of Proposition 13 construed in *Richmond, supra,* 31 Cal.3d 197, but it is not: as we have seen, Proposition 13 speaks only of "special districts" and does not define them, while Proposition 62 applies to any "district" and defines that term so broadly as to include districts that are not authorized to levy a property tax. The rule petitioner invokes is therefore inapplicable.

---

[9]The most we can say about the mooted phrase of section 53723 is that it may have been inserted to emphasize the fact that the section's new requirement that districts imposing general taxes obtain majority voter approval was intended to apply not just to those districts subject to Proposition 13 under the *Richmond* decision—i.e., districts having the power to levy property taxes—but to all districts, "whether or not authorized to levy a property tax." Although the same intensive phrase could have been inserted in section 53722, its drafters apparently saw no need to do so.

Petitioner next relies on the fact that the ballot argument in support of Proposition 62 mentioned our decision in *Farrell, supra,* 32 Cal.3d 47, as a target of the measure, but did not similarly cite *Richmond.* The point is unpersuasive for several reasons. Ballot arguments are not legal briefs and are not expected to cite every case the proposition may affect. Here Proposition 62 proposed to make a number of changes in the law of local taxation, affecting both general and special taxes, and the ballot argument did not attempt to list all of them. (Cf. *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 802 [268 Cal.Rptr. 753, 789 P.2d 934] ["The most reasonable inference is that the proponents chose to emphasize (in the limited space available for ballot arguments) what they perceived as the greatest need."].) Nevertheless, the argument did confirm that the measure was intended to affect *all* types of local taxes, telling the voters at the outset that "A YES vote on Proposition 62 gives back your right to vote on *any* tax increases proposed by your local governments." (Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 4, 1986), argument in favor of Prop. 62, p. 42, italics added.) Similarly, the Legislative Analyst told the voters that Proposition 62 "establishes new requirements for the adoption of new or higher *general and special* taxes by local agencies." (*Id.,* analysis by Legislative Analyst, p. 40, italics added.) The voters therefore had no reason to believe that Proposition 62 would not apply to one class of special taxes—those imposed by districts without property taxing power.

In addition, petitioner cites two unsuccessful ballot measures that assertedly "would have constitutionally overruled *Richmond,*" *supra,* 31 Cal.3d 197. From the fact that the measures failed to pass, petitioner infers that the electorate does not want the requirement of a two-thirds voter approval for local taxes to be extended beyond the circumstances of *Richmond,* i.e., to include taxes imposed by districts lacking the power to levy a property tax. The inference is unreasonable. Petitioner first invokes Proposition 36 on the 1984 General Election Ballot. But that measure proposed a wide-ranging revision of virtually every aspect of Proposition 13, adopted just six years earlier; only one of its numerous provisions (§ 8) addressed local taxes. To be sure, that provision would have required a two-thirds voter approval of any tax imposed by any local governmental entity, and if it had passed it would thus have had the incidental effect of overruling *Richmond.* But it would be rank speculation for us to infer the opposite: because we cannot know why the voters rejected Proposition 36, we cannot assume that their rejection of the measure as a whole implied that, conversely, they approved of the *Richmond* decision in particular.

Petitioner also invokes Proposition 136 on the 1990 General Election Ballot. That measure had a much more modest aim: its main effect would

have been to reenact Proposition 62 by incorporating its principal provisions into the Constitution. Again we cannot know why the voters rejected Proposition 136 only four years after adopting its substance in Proposition 62.[10] Whatever the reason, again we cannot speculate that the rejection amounted to an implied approval of the *Richmond* decision. ■ We have often observed that "Unpassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323], and cases cited.) The same is true of unpassed constitutional amendments.

Lastly, petitioner relies on an opinion of the Legislative Counsel, written before the vote on Proposition 62, to the effect that if it passed it would not apply to a special tax imposed by a local transit district lacking the authority to levy a property tax. (Ops. Cal. Legis. Counsel, No. 18082 (July 9, 1986) p. 11.) ■ While an opinion of the Legislative Counsel is entitled to respect, its weight depends on the reasons given in its support. ■ Here the Legislative Counsel based his opinion on two reasons, but they are reasons that we have already considered and found wanting—the assertedly significant difference in wording between sections 53722 and 53723, and the alleged similarity between section 53722 and the constitutional provision construed in *Richmond, supra,* 31 Cal.3d 197. Because these reasons are unpersuasive, as explained above, the opinion cited by petitioner is of little weight.

We conclude that section 53722 applies to petitioner.

### III

Petitioner contends that if section 53722 is applicable, it is unconstitutional on two principal grounds. We shall conclude that the statute is constitutional.

■ Petitioner first contends the requirement of section 53722 that taxes imposed by a local government be approved by the voters violates the constitutional prohibition against subjecting tax statutes to a referendum. Petitioner relies on section 9 of article II of the Constitution, which provides

---

[10]One obvious possibility, of course, is that the voters may have been willing to enact Proposition 62 as a statute but unwilling to enshrine it in the Constitution as Proposition 136. But perhaps the reason was more mundane. In the 1990 General Election there was something of a voter revolt against the continuing proliferation of propositions on the statewide ballot: the voters were asked to approve no less than 27 propositions, but they turned down 21 of them—a rejection rate of 77 percent. Perhaps Proposition 136 was simply an unwitting victim of this Tuesday-night massacre.

in relevant part that "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a) (hereafter article II, section 9(a)).)[11]

Petitioner also contends the specific requirement of section 53722 that *special* taxes imposed by a local government be approved by a two-thirds majority of the voters violates the constitutional declaration that a referendum needs only a simple majority to pass. In this regard petitioner relies on the succeeding section of article II, which provides in relevant part that "An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise." (Cal. Const., art. II, § 10, subd. (a) (hereafter article II, section 10(a)).)

Whatever their differences,[12] the two contentions share a common premise: each assumes that the voter approval requirement of section 53722 *is a referendum within the meaning of the Constitution.* This premise is essential to petitioner's case, because if it is not true—if the voter approval requirement is not a referendum—the quoted constitutional commands are simply not addressed to the statute before us and both of petitioner's contentions collapse into irrelevance.

Petitioner advances several arguments in support of its premise that the voter approval requirement of section 53722 is a referendum within the meaning of the Constitution. As will appear, none is persuasive.

First, petitioner seeks to make the voter approval requirement of section 53722 fit the definition of referendum as it appears in the Constitution. Petitioner emphasizes the constitutional definition of the referendum as the voters' power to "approve or reject statutes." (Art. II, § 9(a).) Petitioner then stresses a procedural provision of Proposition 62 that declares that a tax subject to its voter approval requirements must be "proposed" by an ordinance or resolution of the local legislative body. (§ 53724, subd. (a).) Petitioner concludes that when the electors vote on a tax "proposed" by a local legislative body, "they are plainly 'approv[ing] or reject[ing]' a statute, inasmuch as the tax being passed upon by them will become a statute (or ordinance) *only* if they approve."

---

[11]The same exception impliedly limits the exercise of the referendum power reserved to local electors. (Cal. Const., art. II, § 11; *Rossi* v. *Brown, supra,* 9 Cal.4th 688, 698.)

[12]For example, the first contention would invalidate both section 53722 (special taxes) and section 53723 (general taxes), while the second contention would invalidate only section 53722, because section 53723 requires no more than a simple majority for voter approval of general taxes.

Despite these superficial similarities between Proposition 62 and the constitutional referendum, a close reading of their terms reveals their essential differences. First, the voter approval required by Proposition 62 is a condition precedent to the enactment of each tax statute to which it applies, while the constitutional referendum may be invoked only after the statute has been enacted. Second, a statute subject to Proposition 62 does not become law until the legislative body submits it to the voters and they approve it, while a statute subject to the constitutional referendum automatically becomes law unless the voters themselves take the initiative and petition to disapprove it. These distinctions appear on the face of Proposition 62 and the constitutional referendum provision.

Thus at each step of the legislative process before the tax is submitted to the voters Proposition 62 describes the tax as merely "proposed." As petitioner notes, the process begins when the tax is "proposed" by an ordinance or resolution of the local legislative body. (§ 53724, subd. (a).) The ordinance or resolution "proposing such tax" must state the type, rate, and method of collection of the tax, the date of the election, and, if a special tax, its purpose. (*Ibid.*) If the tax is a general tax, the ordinance or resolution "proposing such tax" must also be approved by two-thirds of the legislative body. (*Id.*, subd. (b).) The vote of the electorate on "any tax proposed" pursuant to Proposition 62 must be held at a regularly scheduled election (§ 53724, subd. (c)), unless the local legislative body provides otherwise for "any tax proposed" by the measure (*id.*, subd. (d)). In sum, because the tax is thus still "proposed" at the time it is voted on by the electorate, it has evidently not yet been "enacted."

This conclusion is confirmed by other provisions of Proposition 62. As we have seen, the sections prescribing the voter approval requirements of the measure (§§ 53722, 53723) declare that no local entity may "impose" a general or special tax "unless and until" the tax is "submitted to . . . and approved by" the required proportion of the electorate. It is apparent that if a tax is not deemed "imposed"—which in this context means enacted— "unless and until" it is "approved" by the voters, the approval is a precondition to such enactment. Without that approval, the measure will not take effect—in other words, will not become law.

The constitutional referendum operates very differently. It is initiated when a petition asking that a statute be reviewed by the electorate and bearing the required number of signatures is filed with the Secretary of State within 90 days "after the *enactment* date of the statute . . . ." (Cal. Const., art. II, § 9, subd. (b), italics added.) The same section reinforces the point by further requiring that a copy of the petition be timely furnished to the

Attorney General in the case of "a statute *enacted* by a bill *passed* by the Legislature" before its adjournment for a mid-session recess. (*Ibid.*, italics added.) These provisions make it clear that the constitutional referendum is not part of the enactment process in the Legislature, but operates after that process has done its work and has produced "a statute enacted by a bill passed by the Legislature."[13] For the same reason such a statute requires no approval by the voters to become law: it will automatically take effect unless a timely referendum petition is filed.

█ In contrast to Proposition 62, therefore, the constitutional referendum is " 'the right reserved to the people to adopt or reject any act or measure which has been passed by a legislative body, and which, in most cases, *would without action on the part of the electors become a law.*' " (*Referendum Committee* v. *City of Hermosa Beach* (1986) 184 Cal.App.3d 152, 157 [229 Cal.Rptr. 51], quoting *Whitmore* v. *Carr* (1934) 2 Cal.App.2d 590, 592 [38 P.2d 802], italics added.) " 'Enactment is not a quality of the referendum. . . . The referendum is limited in its operation to the adoption or rejection of legislation *already enacted by a legislative body*, and in the absence of such prior enactment there can be neither [rejection] . . . nor adoption by the electorate.' " (*Ibid.*, italics added.) In short, "Referenda do not enact law . . . ." (184 Cal.App.3d at p. 157.)

█ Petitioner also stresses that the constitutional referendum can be invoked only against a statute that has not yet *taken effect* (Cal. Const., art. II, § 9, subd. (b) [petition must be filed within 90 days after enactment date (see *id.*, art. IV, § 8, subd. (c))]), and the filing of a referendum petition stays the effective date of the statute until it is voted on by the electorate (*id.*, art. II, § 10(a); *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 654-657 [180 Cal.Rptr. 297, 639 P.2d 939]). Petitioner contends that Proposition 62 likewise "purports to suspend the effective date of a tax ordinance, after it is enacted by the local legislative body, until the measure can be voted on by the electorate." As shown above, however, Proposition 62 in fact operates otherwise: because the electorate votes on the measure before it is "enacted," a favorable vote does not lift the stay of an "effective date" that the ordinance never had; rather, it is only after that vote has been held that the ordinance is enacted, acquires an effective date, and becomes law.

It follows that petitioner's procrustean effort to make the voter approval requirement of section 53722 fit the constitutional definition of a referendum is unavailing. "In contrast to a referendum, which is initiated by a petition

---

[13]Similarly, the code requires that across the top of each page of a referendum petition there shall be printed in boldface type, "Referendum Against *an Act Passed by the Legislature.*" (Elec. Code, § 9010, italics added.)

signed by a relatively small percentage of the electorate and operates to suspend the effectiveness of a duly enacted legislative act that would otherwise go into effect of its own accord (see, e.g., *Whitmore* v. *Carr* (1934) 2 Cal.App.2d 590, 592 [38 P.2d 802]), the voter-approval provision of section 53722 is a legislatively mandated requirement that applies in every instance without initiation by the voters and is an essential prerequisite to the valid enactment of any tax measure to which the section applies." (*Rider*, *supra*, 1 Cal.4th 1, 22, fn. omitted (conc. opn. of George, J.).)

Petitioner next contends that the Legislature itself characterizes as "referendums" certain measures submitted to the voters without the necessity of a petition. For this point petitioner cites primarily Elections Code section 9140 (former Elec. Code, § 3750), which provides: "The board of supervisors [of a county] may submit to the voters, without a petition, an ordinance for the repeal, amendment, or enactment of any ordinance. The ordinance shall be voted upon at any succeeding regular or special election and, if it receives a majority of the votes cast, the ordinance shall be repealed, amended, or enacted accordingly." Petitioner then stresses that section 9140 is found in an article of the code bearing the heading "Referendum." (Elec. Code, div. 9, ch. 2, art. 2.)

The point lacks merit for several reasons. First, the fact that no petition is required is the *only* similarity between the voter approval mechanism of Elections Code section 9140 and that of Proposition 62; they are not comparable in any other respect. Section 9140 is essentially a procedural device to permit a county board of supervisors to put a legislative matter on the ballot without waiting for the electorate to do so by initiative; the board may choose to do so, for example, if the matter is politically sensitive or controversial, and it will ordinarily be compelled to do so if it wishes to amend or repeal an ordinance that was itself adopted by initiative (see Elec. Code, § 9125). Second, the voter approval mechanism of Elections Code section 9140 is not a true referendum in any event. To the extent section 9140 authorizes a vote to "enact" or "amend" an ordinance it is not a referendum because, as noted above, "Referenda do not enact law . . . ." (*Referendum Committee* v. *City of Hermosa Beach, supra*, 184 Cal.App.3d 152, 157.) That is the function of the initiative. And to the extent section 9140 authorizes a vote to "repeal" an ordinance it is not a referendum because the statute does not require the vote to be held before the ordinance takes effect, as a true referendum does (see, e.g., Elec. Code, §§ 9144-9145 [referendum on county ordinances]); rather, the vote may be held "at *any* succeeding regular or special election" (*id.*, § 9140, italics added). The repeal of an already effective ordinance is also an exercise of the initiative power. (See *Rossi* v. *Brown, supra*, 9 Cal.4th 688.) Third, our conclusion is

not affected by the fact that section 9140 is found in an article bearing the heading "Referendum," because "article . . . headings do not in any manner affect the scope, meaning, or intent" of the code. (Elec. Code, § 5.)

Petitioner also relies on a number of asserted precedents, but none is compelling. Petitioner first cites three opinions in which the United States Supreme Court and this court used the word "referendum" in referring to other voter approval requirements similar to Proposition 62. (*Eastlake* v. *Forest City Enterprises, Inc.* (1976) 426 U.S. 668 [49 L.Ed.2d 132, 96 S.Ct. 2358] (*passim*); *James* v. *Valtierra* (1971) 402 U.S. 137 [28 L.Ed.2d 678, 91 S.Ct. 1331] (*passim*); *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 777, fn. 16, 790, fn. 48, 794, fn. 53 [87 Cal.Rptr. 839, 471 P.2d 487]; see also *Rossi* v. *Brown*, *supra*, 9 Cal.4th 688, 710, fn. 15 [referring to Proposition 62].) In each case, however, the court used the word simply as a label of convenience, a shorthand way of referring to the particular voter approval mechanism it was discussing. In that usage the word "referendum" has the broad meaning given to it in common speech—i.e., any kind of popular vote or plebiscite on a public question or measure—and that definition includes *both* the constitutional referendum and the type of voter approval requirement exemplified by Proposition 62.[14] In none of the cited cases, moreover, did the court resolve the issue now before us, to wit, whether a voter approval requirement like that of Proposition 62 is a referendum within the meaning of the Constitution. It is axiomatic that an opinion is not authority for an issue not considered therein. (*People* v. *Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769], and cases cited.)

More to the point is the case on which petitioner principally relies, *City of Woodlake* v. *Logan*, *supra*, 230 Cal.App.3d 1058 (hereafter *Woodlake*). In 1989 the City Council of Woodlake, a general law city, enacted a tax on utility services supplied to its residents. The tax was levied to benefit the city's general fund. It was thus a "general tax" within the meaning of Proposition 62 (§ 53721), just as the city was a "local government" within the meaning of that measure (§ 53720, subd. (a)). Proposition 62 therefore applied: under section 53724 the city was required to submit the tax as a proposal to the local electorate, and under section 53723 the city was barred from imposing the tax unless and until it was approved by a majority of the electors voting on it.

The city did not submit the tax to the voters, but nevertheless began to collect it. As required by the enforcement provision of Proposition 62

---

[14]For example, a leading dictionary broadly defines "referendum" as the practice of "submitting to popular vote a measure passed upon *or* proposed by a legislative body *or* by popular initiative . . . ." (Webster's New Internat. Dict. (3d ed. 1961) p. 1908, italics added.)

(§ 53728), the County of Tulare reduced the city's share of the general property taxes it collected by an amount equal to the proceeds of the utility tax. The city sought declaratory relief, challenging the constitutionality of sections 53723, 53724, and 53728. The trial court ruled the provisions constitutional and granted summary judgment for the defendant county auditor. The Court of Appeal held the provisions unconstitutional, however, and reversed the judgment.

On appeal the defendant contended the voter approval requirement of section 53723 was not a referendum within the meaning of the Constitution. Asserting that under our Constitution (art. XIII, § 24) local governments have only such power to tax as the Legislature grants to them, the defendant argued that Proposition 62 simply adds a condition—voter approval—to the Legislature's general grant of such authority to local governments to levy a general tax. As will appear, the reasoning was sound.

The Court of Appeal, however, rejected the contention: although it recognized differences between the constitutional referendum and section 53723, the court held them to be inconsequential: "Generally the referendum is triggered by petition of the voters in response to legislative enactment. [Citation.] Sections 53723 and 53724 bypass the need for petition by mandating automatic submission of tax measures to the voters. Nonetheless, the result is the same—approval or rejection by the voters of *a legislative enactment which would otherwise become law*. [Citations.] This is the very type of 'indirect or backhanded [referendum] technique' condemned in *Myers* v. *City Council of Pismo Beach* [(1966) 241 Cal.App.2d 237, 243 (50 Cal.Rptr. 402)], and *Dare* v. *Lakeport City Council* [(1970) 12 Cal.App.3d 864 (91 Cal.Rptr. 124)]." (230 Cal.App.3d at pp. 1065-1066, italics added.)

The reasoning of the Court of Appeal is doubly flawed. First, the emphasized language is a misreading of Proposition 62: as we have seen, at the point when a tax is submitted to the voters under that measure it has not yet been "enacted," and if it is not approved by the voters the tax does not "otherwise become law."

Second, the Court of Appeal's reliance on *Myers* v. *City Council of Pismo Beach* (1966) 241 Cal.App.2d 237 [50 Cal.Rptr. 402] (*Myers*), and its progeny is misplaced in light of our recent decision in *Rossi* v. *Brown, supra,* 9 Cal.4th 688 (*Rossi*). In *Rossi* this court upheld an initiative prospectively repealing a utility users tax that had already taken effect and barring the local legislative body from adopting such a tax in the future. It is true that the *facts* of *Rossi* are distinguishable: the case did not involve, as here, an initiative subjecting all new taxes proposed by a local legislative body to the

condition of prior voter approval. But the *reasoning* of *Rossi* is equally applicable to the issue before us.

In rejecting the contention that the initiative in question was in effect a referendum on a tax—i.e., an "indirect or backhanded" referendum, in the words of *Myers*—this court in *Rossi, supra*, 9 Cal.4th at page 703, began by reiterating the policy underlying the constitutional prohibition against referendums on tax measures: " 'One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies.' (*Geiger* v. *Board of Supervisors* [(1957)] 48 Cal.2d [832,] 839-840 [313 P.2d 545] [*Geiger*].) [¶] We concluded in *Geiger, supra*, that the same reasoning applied to referenda directed to acts of a county board of supervisors. Managing the county government's financial affairs, we reasoned, was entrusted to elected representatives, and was an essential function of the board which could not accurately estimate income if tax ordinances were subject to referenda. (48 Cal.2d at p. 840.)"

This court reasoned in *Rossi, supra*, that the foregoing policy is not violated by an initiative prospectively repealing an existing tax: by definition the repeal comes too late to affect the planning that went into the local government's current budget, and in planning future budgets the local government officials will be on notice that they cannot rely on the tax until the electors vote on the initiative. (9 Cal.4th at pp. 703-704.) "Therefore, the potential for disruption of local government services by qualification of a referendum petition on a newly enacted tax measure is not present in the procedures leading to possible passage of an initiative which prospectively repeals an existing tax." (*Id.* at p. 704.)

This reasoning also governs the case at bar: "the Constitution withholds the referendum power with regard to tax measures in recognition of the fact that when a legislative body establishes tax levels in connection with the budget process, the governmental entity must be able to rely on the receipt of those tax revenues and cannot have the viability of such measures continually placed in doubt by the possibility that a referendum may be initiated by a relatively small percentage of the electorate. [Citations.] This reason for limiting the referendum power, however, does not apply to a voter-approval requirement that, under the governing statutes, constitutes an essential precondition to a local entity's authority to impose a particular tax. Because such a prior-voter-approval requirement always will be known in advance, the local legislative body will be aware that it lacks the power to levy the tax

*until* voter approval has been obtained, and thus the local entity will not include the anticipated tax revenue in its enacted budget until after the electorate has approved the tax." (*Rider, supra,* 1 Cal.4th 1, 23 (conc. opn. of George, J.).)

This error also infected the Court of Appeal's analysis of the second contention raised in *Woodlake, supra,* 230 Cal.App.3d 1058. The defendant argued (*id.* at p. 1066) that if the Legislature has the power to impose voter approval requirements on taxes that it levies itself, it may likewise condition the taxing power of local governments, and hence the same condition may be imposed by a statutory initiative such as Proposition 62. But rather than answering that contention,[15] the Court of Appeal recast the question in terms of the referendum power. First the court asserted that Proposition 62 "mandates local referendums on tax issues." (230 Cal.App.3d at p. 1066.) Next the court declared that "The real question presented by this issue is whether the Legislature may expand the [local] referendum power by ignoring express restrictions appearing in the Constitution." (*Id.* at p. 1067.) The court then answered *that* question in the negative, relying on certain reasoning in *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836-837 [313 P.2d 545], to the effect that the presence of express restrictions on the statewide referendum power in the Constitution (art. II, § 9(a)) implies that the Legislature has no authority to waive those restrictions in prescribing procedures for the exercise of the local referendum power (Cal. Const., art. II, § 11). *Geiger,* however, dealt with a true referendum;[16] and because section 53723, like section 53722, is not such a referendum, the reasoning of *Geiger* cited by the court is not in point here. Thus the *Woodlake* court failed to respond to the defendant's contention, answered a question that the defendant did not ask, and in so doing incorrectly assumed that section 53723 is a referendum within the meaning of the Constitution.

For all the foregoing reasons, the decision in *Woodlake, supra,* 230 Cal.App.3d 1058, is erroneous, and it is hereby disapproved.[17]

Lastly, petitioner contends that the voter approval requirement of section 53722 must be a referendum "because the Constitution does not permit any

---

[15]The court did "question" the defendant's major premise, but declined to discuss it because it was "not the issue here." (230 Cal.App.3d at p. 1066.)

[16]In *Geiger* v. *Board of Supervisors, supra,* 48 Cal.2d 832, a county board of supervisors enacted a sales and use tax. Prior to the effective date of the ordinance, a taxpayer presented a petition demanding that the board either repeal the ordinance or submit it to a vote of the electorate. This is a common form of the local referendum in California, the "indirect referendum." (Now see Elec. Code, §§ 9144-9145 [referendum on county ordinances], 9237, 9241 [referendum on municipal ordinances].)

[17]For identical reasons we find unpersuasive an opinion of the Attorney General that petitioner also cites, insofar as it concludes that a statute (Rev. & Tax. Code, § 7285) containing a voter approval requirement similar to that of section 53722 is an impermissible

other involvement of the electorate in the legislative process." ■ Petitioner relies on article IV, section 1, of the Constitution, which provides that "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum." Petitioner asserts that this provision of the Constitution divides the entire legislative power of the state between the Legislature and the people's reserved right of initiative and referendum, and that the initiative and referendum are therefore the sole methods by which the people may constitutionally exercise legislative power. We agree. ■ Petitioner then contends, however, that the vote that section 53722 requires is also an exercise of legislative power by the people, and hence must be a referendum. We disagree. The answer to petitioner's contention lies in another provision of the Constitution—article XIII, section 24.

The first sentence of article XIII, section 24, of the Constitution (hereafter article XIII, section 24) provides: "The Legislature may not impose taxes for local purposes but may authorize local governments to impose them." The sentence contains two clauses. The first clause—"The Legislature may not impose taxes for local purposes"—is a restriction on the Legislature's otherwise plenary power of taxation (see, e.g., *Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 568 [154 P.2d 674]): the clause prohibits the Legislature from imposing a particular *class* of taxes, viz., taxes whose proceeds are devoted to purely "local" purposes. (See, e.g., *People* v. *Martin* (1882) 60 Cal. 153, 155-156 [under predecessor to article XIII, section 24, Legislature had no power to impose local business license tax to benefit county general fund]; see also *City of Los Angeles* v. *Riley* (1936) 6 Cal.2d 621, 623-624 [59 P.2d 137] [distinction between "local" and "state" purposes of a tax].)

■ Complementing the first clause, the second clause of the constitutional provision—i.e., the Legislature "may authorize local governments to impose" local taxes—is a confirmation of the Legislature's authority to grant the taxing power to local governments insofar as necessary to enable them to

---

referendum on a tax. (73 Cal.Ops.Atty.Gen. (1990) 111, 113-114; but see *id.* at p. 115, fn. 12 ["The constitutionality of Government Code sections 53720-53730 [i.e., Proposition 62] is beyond the scope of this opinion."].)

We need not determine the correctness, however, of *City of Westminster* v. *County of Orange, supra,* 204 Cal.App.3d 623, the decision that held unconstitutional the provision of Proposition 62 (§ 53727, subd. (b)) requiring voter approval of taxes imposed during a 16-month window period preceding the effective date of the proposition (Nov. 5, 1986), the vote to be held within 2 years after that date. The case appears distinguishable (see *Rider, supra,* 1 Cal.4th 1, 23-24, fn. 6 (conc. opn. of George, J.)), and the parties do not rely on it. In any event, it is doubtful that any such taxes remain at issue today, since the deadline for voting on them expired almost seven years ago (Nov. 5, 1988).

impose such local taxes if they see fit. That grant of power is an essential prerequisite to all local taxation, because local governments have no inherent power to tax. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 73 [37 Cal.Rptr. 74, 389 P.2d 538]; *County of Mariposa* v. *Merced Irr. Dist.* (1948) 32 Cal.2d 467, 474 [196 P.2d 920]; *County of Los Angeles* v. *Sasaki* (1994) 23 Cal.App.4th 1442, 1454 [29 Cal.Rptr.2d 103]; *Marin Hospital Dist.* v. *Rothman* (1983) 139 Cal.App.3d 495, 501-502 [188 Cal.Rptr. 828], and cases cited.) In language equally applicable to all forms of local government, a leading treatise explains that "Municipal corporations have no inherent power of taxation. On the contrary, municipal corporations possess with respect to taxation only such power as has been granted to them by the constitution or statutes. This is true particularly with reference to those political subdivisions of the state which do not have full municipal status but which are constituted for special purposes and with limited powers and functions," e.g., special districts like petitioner herein. (16 McQuillin, Municipal Corporations (3d rev. ed. 1994) § 44.05, p. 17, fns. omitted [hereafter McQuillin].)

▇▇▇ The Legislature's authority to grant taxing power to local governments, moreover, includes the authority to prescribe the terms and conditions under which local governments may exercise that power: "If the legislature grants this power to these subordinate divisions of the government, it has the right to say, by the grant, in what manner that power shall be exercised." (*Ex Parte Pfirrmann* (1901) 134 Cal. 143, 149 [66 P. 205].) As this court observed over a century ago, "While the constitution has taken from the legislature the power to impose taxes upon counties or other public corporations, it has not given to such corporations any power whatever to impose taxes, but has authorized the legislature to vest such power in them by general laws. (Const., art. XI, sec. 12 [now art. XIII, § 24].) The power of a county or other public corporation to impose any tax is only that which is granted by the legislature, and *its exercise must be within the limits and in the manner so conferred*." (*Hughes* v. *Ewing* (1892) 93 Cal. 414, 418 [28 P. 1067], italics added.) Again this is the general rule: "Except as prohibited or limited by the constitution, and *with such restrictions as it deems fit*, . . . the state may confer such power as it deems proper or expedient . . . . [¶] The taxing power delegated may be only a part of that possessed by the state *or may be limited in any way*, . . . ." (McQuillin, *supra*, § 44.07, p. 30, fns. omitted, italics added.)

Finally, even when it has been thus granted, the taxing power of a local government does not become a vested right of that entity but remains at all times subject to amendment or repeal by the Legislature. (*In re Redevelopment Plan for Bunker Hill, supra*, 61 Cal.2d 21, 73; *Marin Hospital Dist.* v.

*Rothman, supra*, 139 Cal.App.3d 495, 501-502.) "Municipal corporations do not have, as to the taxing power, vested rights which may not be affected by subsequent legislation. The power to levy taxes, where delegated by the legislature to municipal corporations, is during the pleasure of the legislature, so that it may be revoked, modified, or limited at any time." (McQuillin, *supra*, § 44.14, p. 58, fns. omitted.)

For example, in authorizing local governments to levy local sales and use taxes (Rev. & Tax. Code, § 7200 et seq. [Bradley-Burns Uniform Local Sales and Use Tax Law]) the Legislature imposed elaborate conditions on the exercise of that power: thus the Legislature itself fixed the rate of the tax (*id.*, §§ 7202, subd. (a), 7203), prescribed both general and specific provisions of the taxing ordinance (*id.*, §§ 7202, subds. (b)-(e), 7203, subds. (a)-(b)), mandated a series of tax exemptions and credits (*id.*, §§ 7202, subds. (f)-(h), 7202.5, 7203, subds. (c)-(e)), and required the local governments to contract with the State Board of Equalization to administer and collect the tax at the local governments' expense (§§ 7202, subd. (d), 7204, 7204.3). The Legislature added or amended many of these conditions, moreover, long after its original grant of this taxing power to local governments.

The Legislature placed similarly elaborate conditions on the power it granted to certain counties and districts to impose additional "transactions and use" taxes. (Rev. & Tax. Code, §§ 7251 et seq. [Transactions and Use Tax Law], 7285 et seq. [Counties Transactions and Use Tax Law].)

In authorizing counties to levy a motor vehicle fuel tax for local transportation purposes, the Legislature likewise mandated the method of imposing and collecting the tax, specified provisions of the taxing ordinance, prescribed tax exemptions, and restricted the uses to which the proceeds of the tax could be put. (Rev. & Tax. Code, §§ 9501-9507.)

Again, in authorizing local governments to impose a sales tax on certain consumer products for purposes of graffiti prevention, the Legislature prescribed the maximum allowable tax rate, the maximum life of the tax, the method of its collection, the allocation of its proceeds, and the disposition of overpayments and refunds. (Rev. & Tax. Code, §§ 7287-7287.10.)

In a series of statutes the Legislature also authorized special districts to impose local sales taxes for the purpose of financing the construction and operation of certain categories of public facilities. One category is exemplified by the statute at issue in *Rider, supra*, 1 Cal.4th 1, i.e., taxes to fund criminal detention and courthouse facilities. (Gov. Code, §§ 26250-26285

[San Diego County Regional Justice Facility Financing Act]; now see Rev. & Tax. Code, §§ 7286.30-7286.38.)[18] Another category is exemplified by the statute that authorized the tax at issue in the case at bar, i.e., taxes to fund streets, highways, and mass transit systems. (Pub. Util. Code, §§ 180000-180264 [Local Transportation Authority and Improvement Act].)[19] In each of these statutes the Legislature typically specified the rate and maximum life of the tax, prescribed the method of imposing and collecting it, and mandated the purposes for which the proceeds could be used.

 The requirement of voter approval before a local government enacts a proposed tax is another such condition on the exercise of local taxing power. If the local government chooses to exercise that power, the Legislature may require it to take several steps in order to impose the tax. One of those steps is to obtain the approval of a specified proportion of the votes of the members of the local legislative body. (See, e.g., Rev. & Tax. Code, §§ 7285, 7285.5; Gov. Code, § 53724, subd. (b) [Proposition 62].) Another such step is to obtain the approval of a specified proportion of the votes of the local electors. Thus in the statutory schemes cited above the Legislature included, among the conditions for imposing the taxes in question, the requirement that the local electorate approve such taxes either by a simple majority (Rev. & Tax. Code, §§ 7285, 7285.5, 9502) or by a two-thirds vote (*id.*, §§ 7286.32, 7287; Gov. Code, § 26298.2). Indeed, the statute that authorized the tax at issue here—the very statute to which petitioner owes its existence—prescribes such a condition: "A retail transactions and use tax ordinance applicable in the incorporated and unincorporated territory of a county may be imposed by the [local transportation] authority in accordance with this chapter and [the Transactions and Use Tax Law], *if the tax ordinance is adopted by a two-thirds vote of the authority and imposition of the tax is subsequently approved by a majority of the electors voting on the measure* at a special election called for that purpose by the board of supervisors, at the request of the authority, . . ." (Pub. Util. Code, § 180201, italics added.)

There is nothing unusual about such voter approval requirements. They have a long history in this state (see, e.g., *Hobart* v. *The Supervisors of Butte*

---

[18](See also, e.g., Gov. Code, §§ 26295 et seq. [Orange County Regional Justice Facilities Act], 26299.000 et seq. [County Regional Justice Facilities Financing Act], both discussed in *Howard Jarvis Taxpayers' Assn.* v. *State Bd. of Equalization* (1993) 20 Cal.App.4th 1598 [25 Cal.Rptr.2d 330].)

[19](See also, e.g., Pub. Util. Code, §§ 130000 et seq. [County Transportation Commissions Act, discussed in *Richmond, supra*, 31 Cal.3d 197], 132000 et seq. [San Diego County Regional Transportation Commission Act], 140000 et seq. [Santa Clara County Commuter Relief Act].)

*County* (1860) 17 Cal. 23), and today may be found throughout our codes: including those just cited, more than 60 statutes currently prescribe such a requirement. A few relate to matters other than taxation (e.g., local option laws); but most, like section 53722, authorize local governments to levy various kinds of taxes on condition that they first obtain the approval of their electorates. Of these, approximately one-half require such approval by a simple majority,[20] while the other half require approval, as here, by a two-thirds vote.[21] To accede to petitioner's argument would cast into doubt the validity of this entire body of statutory law.[22]

Petitioner endeavors to avoid the effect of article XIII, section 24, by offering a narrow reading of the provision. Petitioner reasons that even without article XIII, section 24, the Legislature would have the power to authorize local governments to impose taxes, because that power is necessarily included in—and hence inferable from—the Legislature's plenary power to tax under article IV, section 1, of the Constitution. We may grant the premise for purposes of argument. From this premise, however, petitioner concludes that the second clause of article XIII, section 24, declaring that the Legislature may authorize local governments to impose taxes, "is surplusage unless it is construed to mean that the Legislature has simply two options in respect to local taxation: it may either grant such power or withhold such power. The Legislature is not given a third option under the Constitution of conditioning such power upon voter approval."

We cannot agree with petitioner's conclusion. First, it is too harsh to condemn the second clause of article XIII, section 24, as "surplusage." To be sure, the principal purpose of article XIII, section 24, is to

[20](See, e.g., Ed. Code, §§ 39274, 39312; Gov. Code, §§ 26292.1, 29561, 60125, 61755.5, 68059.7; Health & Saf. Code, §§ 20101, 32203, 32221; Pub. Resources Code, §§ 5104, 5545.1, 5784.13; Pub. Util. Code, §§ 130350, 130401, 131102, 132301, 140251, 142250, 150201, 180201, 190300, 240301; Rev. & Tax. Code, §§ 2280.01, 2286, 7285, 7285.5, 7288.3, 9502, 11103.)

[21](See, e.g., Ed. Code, § 43041; Gov. Code, §§ 26172.3, 26298.2, 50079, 50079.1, 53328, 53717, 53730.01, 53978, 66013, 66014; Health & Saf. Code, §§ 2303, 32205, 41081; Pub. Resources Code, §§ 33804, 35172; Pub. Util. Code, §§ 12891.5, 16641.5, 22909; Rev. & Tax. Code, §§ 7262.5, 7262.6, 7262.7, 7286.20, 7286.32, 7286.40, 7286.45, 7287, 11152; Sts. & Hy. Code, §§ 1178, 5832.8, 8195.)

[22]Without analysis, petitioner suggests that any such risk of wholesale unconstitutionality could be avoided by "severing" the voter approval requirements of such statutes from their provisions granting taxing power to local governments. But the rules of severability (see, e.g., *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821-822 [258 Cal.Rptr. 161, 771 P.2d 1247]) are to be applied on a statute-by-statute basis, and under those rules we would have great difficulty in concluding that the electorate would have adopted section 53722 without the voter approval requirement. (See, e.g., 73 Cal.Ops.Atty.Gen., *supra*, 111, 115-117 [voter approval requirement of Revenue and Taxation Code section 7285, not severable].)

prohibit the Legislature from imposing local taxes, as it decrees in its first clause. But the second clause serves an ancillary purpose. Rather than leave to inference the important matter of who has the power to tax for local purposes, the drafters chose to spell out the complete scheme: thus the first clause of the provision bars the Legislature from imposing local taxes, while the second clause expressly confirms the Legislature's authority to grant local governments the power to levy such taxes.

The history of the provision corroborates this reading. Although the present provision (art. XIII, § 24) dates only from the 1974 revision of the Constitution, its drafters explicitly noted their intent to simplify the wording but not to change the substance of its predecessors. (Const. Revision Task Force on Art. XIII, Proposed Revision of Art. XIII, Cal. Const., Assem. Const. Amend. 32 (1973-1974 Reg. Sess.), May 6, 1974, p. 29.) The provision originally entered our law as article XI, section 12, of the 1879 Constitution.[23] When the provision was proposed to the constitutional convention an opponent pointedly argued, as petitioner does now, that its second clause was superfluous.[24] Despite this argument, the convention adopted the provision in its entirety. We may fairly infer that the framers did not believe the second clause was surplusage.

In any event, even if the clause were surplusage it would not support petitioner's conclusion that the Legislature lacks authority to condition the exercise of local taxing power on voter approval. Petitioner fails to explain—and we cannot perceive—how it would cure such surplusage to deny that authority to the Legislature. The two concepts simply have nothing in common.

We therefore reject petitioner's contention that the Legislature could not constitutionally condition the enactment of a local tax measure on approval

---

[23]That section provided: "The Legislature shall have no power to impose taxes upon counties, cities, towns, or other public or municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes." (Former Cal. Const., art. XI, § 12.) A 1933 amendment added the introductory clause, "Except as otherwise provided in this Constitution," and from 1970 to 1974 the provision was numbered article XIII, section 37.

[24]The delegate objected that "it seems to me that this is entirely superfluous. There is not a particle of need of it. 'The Legislature may, by general laws, vest in the corporate authorities the power to assess and collect taxes.' Now, there is no occasion for that in there. The Legislature has that power already. There is no occasion for putting permissive clauses in the Constitution. The Legislature is the sovereign power, except as its power is limited by the Constitution of this State and the Constitution of the United States, and so there is no occasion for permissive clauses that the Legislature may do this thing or that thing." (2 Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1065, col. 2 [remarks of Mr. Johnson].)

by the local electorate. ■■■ The remaining question is whether the people could constitutionally do so by initiative, as they did in adopting Proposition 62. Settled rules compel us to answer that question in the affirmative.

■■■ First, "the initiative power must be *liberally construed* to promote the democratic process. [Citation.] Indeed, it is our solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise. [Citation.] As with statutes adopted by the Legislature, all presumptions favor the validity of initiative measures and mere doubts as to validity are insufficient; such measures must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citation.]" (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 501 [286 Cal.Rptr. 283, 816 P.2d 1309], italics in original.)

■■■ Second, and in contrast to the referendum, "our state Constitution does not limit the subject matter of direct legislation proposed by initiative." (*Carlson* v. *Cory* (1983) 139 Cal.App.3d 724, 728 [189 Cal.Rptr. 185].) In particular, the courts have upheld initiative measures addressing, as here, the subject of taxation. (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245 [279 Cal.Rptr. 325, 806 P.2d 1360] [amending cigarette tax]; *Carlson* v. *Cory, supra,* 139 Cal.App.3d 724 [repealing inheritance and gift taxes]; see also *Rossi, supra,* 9 Cal.4th 688 [local initiative repealing utility users tax].)

■■■ Third, to the extent that the initiative is the constitutional power of the electors "to propose statutes . . . and to adopt or reject them" (Cal. Const., art. II, § 8, subd. (a)), it is generally coextensive with the power of the Legislature to enact statutes. (*DeVita* v. *County of Napa* (1995) 9 Cal.4th 763, 775 [38 Cal.Rptr.2d 699, 889 P.2d 1019] [local initiative].)
■■■ Whatever may be the boundaries of that general rule (see *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 714 [206 Cal.Rptr. 89, 686 P.2d 609] ["an initiative which seeks to do something other than enact a statute—which seeks to render an administrative decision, adjudicate a dispute, or declare by resolution the views of the resolving body—is not within the initiative power reserved by the people"]), they are not transgressed by Proposition 62: by approving that measure the electorate adopted a statute that the Legislature itself could have enacted. Section 53722 is therefore within the scope of the initiative power.

Seeking to avoid this rule, petitioner invokes the exception that some courts have recognized "where 'the inevitable effect would be greatly to

impair or wholly destroy the efficacy of some other governmental power . . . .' " (*Simpson* v. *Hite* (1950) 36 Cal.2d 125, 134 [222 P.2d 225].) The exception is inapplicable here, however, because petitioner "point[s] to no essential governmental power which will inevitably be impaired or destroyed by [the voter approval requirement of section 53722]." (*Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225, 231, fn. 4 [118 Cal.Rptr. 158, 529 P.2d 582].) Petitioner does point to the power to tax for revenue purposes, and notes that we have called that power "probably the most vital and essential attribute of the government." (*Watchtower B. & T. Soc.* v. *County of L.A.* (1947) 30 Cal.2d 426, 429 [182 P.2d 178].) But in order for the exception to apply the power must not only be "essential," its serious impairment or wholesale destruction must also be "inevitable." Petitioner makes no such showing.

We conclude that petitioner's contentions that the voter approval requirement of section 53722 violates the referendum clauses of the Constitution (art. II, §§ 9(a), 10(a)) must be rejected because the requirement is not a referendum within the meaning of that document.

■ In its opening brief petitioner contended that Proposition 13's requirement that special taxes imposed by local governments be approved by a two-thirds vote (art. XIII A, § 4) denied the proponents of such taxes federal equal protection of the laws (U.S. Const., 14th Amend.). In oral argument petitioner extended that contention to the two-thirds voter approval requirement of section 53722. The latter claim fails because the former is without merit.

In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 237 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador*), we rejected as follows petitioner's underlying claim that the two-thirds vote requirement of Proposition 13 denies federal equal protection: "We may quickly dispose of the contention. Petitioners rely upon our decision in *Westbrook* v. *Mihaly* [(1970)] 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 487], wherein we held that a two-thirds requirement for approval of county general obligation bonds violated federal equal protection principles. However, our *Westbrook* opinion was vacated by the United States Supreme Court (*Mihaly* v. *Westbrook* (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]) and the cause was remanded for our reconsideration in the light of *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889], a case which upheld a 60 percent vote requirement primarily because no 'discrete and insular minority' was singled out for special treatment by application of the voting requirement. Thus, *Westbrook* no longer represents the controlling law on the

subject. (See *Coffineau* v. *Eu* (1977) 68 Cal.App.3d 138, 143 [137 Cal.Rptr. 90].) Because persons who vote in favor of tax measures may not be deemed to represent a definite, identifiable class, equal protection principles do not forbid 'debasing' their vote by requiring a two-thirds approval of such measures."

Our ruling in *Amador* was thus wholly premised on *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889] (*Gordon*), a decision in which the United States Supreme Court held that the federal equal protection clause was not violated by West Virginia's constitutional and statutory requirement that local governments may not incur bonded indebtedness or increase tax rates beyond those established by the state constitution without the approval of 60 percent of the voters. Petitioner now attempts to distinguish *Gordon* on two grounds, but neither is persuasive.

First, petitioner contends the *Gordon* rule should not apply to tax elections but only to bond elections. Petitioner quotes the following observation made in *Gordon*: "It must be remembered that in voting to issue bonds voters are committing, in part, the credit of infants and of generations yet unborn, and some restriction on such commitment is not an unreasonable demand." (403 U.S. at p. 6 [29 L.Ed.2d at p. 277].) From this remark petitioner infers that the *Gordon* court upheld the West Virginia voter approval requirement because it served a "compelling interest" and hence "any denial of equal protection was justified." Petitioner then argues that "the same rationale" is inapplicable to sales taxes because they can be repealed at any time. The point misstates *Gordon*. Seen in context, the observation that petitioner quotes was not the ratio decidendi of *Gordon* but merely one of several supplementary points the high court made to bolster its primary line of reasoning. That reasoning was clearly laid out in the preceding pages of the opinion. (*Id.* at pp. 2-5 [29 L.Ed.2d at pp. 274-276].)

Thus the high court began by distinguishing the two cases principally relied on by the West Virginia Supreme Court. (*Gray* v. *Sanders* (1963) 372 U.S. 368 [9 L.Ed.2d 821, 83 S.Ct. 801]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897].) The court explained, "The defect this Court found in those cases lay in the denial or dilution of voting power because of group characteristics—geographic location and property ownership—that bore no valid relation to the interest of those groups in the subject matter of the election; moreover, the dilution or denial was imposed irrespective of how members of those groups actually voted." (403 U.S. at p. 4 [29 L.Ed.2d at pp. 275-276], fn. omitted.)

By contrast, the high court continued, "Unlike the restrictions in our previous cases, the West Virginia Constitution singles out no 'discrete and

insular minority' for special treatment. The three-fifths requirement applies equally to all bond issues for any purpose, whether for schools, sewers, or highways." (403 U.S. at p. 5 [29 L.Ed.2d at p. 276].)

Next, the high court contrasted a decision (*Hunter* v. *Erickson* (1969) 393 U.S. 385 [21 L.Ed.2d 616, 89 S.Ct. 557]) in which only fair housing legislation was subject to an automatic referendum requirement, saying: "The class singled out in *Hunter* was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations,' [393 U.S. 385,] *supra*, at 391 [21 L.Ed.2d 616, 622]. In contrast we can discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote." (403 U.S. at p. 5 [29 L.Ed.2d at p. 276].)

That the foregoing was the ratio decidendi of *Gordon* was confirmed by its conclusion, i.e., "that so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause." (403 U.S. at p. 7 [29 L.Ed.2d at p. 277], fn. omitted.)

Nothing in this reasoning limits it, as petitioner claims, to discrimination in voting to issue bonds rather than voting to levy taxes. On the contrary, it is clear the high court drew no such distinction.

First, the West Virginia constitutional and statutory provisions upheld in *Gordon* expressly applied to *both* bonds and taxes. (403 U.S. at p. 2 [29 L.Ed.2d at p. 274].) Thus the high court recited that at the election in question the voters were asked to authorize the issuance of certain school bonds, and "At the same election, by separate ballot, the voters were asked to authorize the Board of Education *to levy additional taxes* to support current expenditures and capital improvements." (*Id.* at p. 3 [29 L.Ed.2d at p. 275], italics added.) Both measures obtained a majority but fell short of the required 60 percent voter approval level, and the action in *Gordon* sought to validate both measures by attacking that requirement as a violation of equal protection. Although the opinion in *Gordon* spoke more of the bond measure than the tax measure, at various points in the opinion the high court referred to provisions removing the *taxing* power from majority control (*id.* at pp. 6, 7 [29 L.Ed.2d at p. 277]) and its general judgment of reversal manifestly applied to the action as a whole.

Secondly, one week after it decided *Gordon* the high court ruled on a companion case that also involved a voter approval requirement for levy of

a tax. In *Brenner v. School District of Kansas City, Missouri* (W.D.Mo. 1970) 315 F.Supp. 627, Missouri constitutional and statutory provisions imposed a two-thirds voter approval requirement on school tax levies and bond issues. At one election a proposed tax levy obtained a majority but fell short of the required two-thirds vote; at another election held on a different date a proposed bond issue drew the same result. An action was filed in federal district court to validate both measures on the ground that the two-thirds voter approval requirement violated the equal protection clause. In a long and scholarly opinion filed before *Gordon*, a three-judge federal panel denied relief as to both measures, ruling that the voter approval requirement was constitutional as to each.

In reasoning that foreshadowed *Gordon*, the federal court distinguished prior voting cases on the ground that they dealt with statutes invidiously discriminating against classes of voters defined by their preexisting status (e.g., race, poverty, place of residence), whereas "The extraordinary two thirds majority requirement obviously involves no possible classification until after all votes are cast and counted because no one can know who may have voted 'yes' or 'no' until that time. And even then, no one is supposed to know who voted which way." (315 F.Supp. at p. 635, fn. 10.)[25] The federal court concluded that "Missouri's two-third majority requirement reflects its choice of decisional rule for a limited purpose election which is calculated to require that a strong consensus of all citizens be demonstrated before school bond and school [tax] levies are to receive approval." (315 F.Supp. at p. 633.)

The decision was appealed to the United States Supreme Court, and the high court summarily affirmed it with a citation to *Gordon*. (*Brenner v. School District of Kansas City, Missouri* (1971) 403 U.S. 913 [29 L.Ed.2d 692, 91 S.Ct. 2232].)

Since *Gordon* was decided, California courts have not hesitated to apply its rule to tax elections as well as bond elections. We did so, of course, in *Amador, supra*, 22 Cal.3d 208, 237, which upheld, against a facial equal protection challenge, the two-thirds voter approval requirement for special taxes imposed by local governments (art. XIII A, § 4). We did so again in *Richmond, supra*, 31 Cal.3d 197, 203, where we prefaced our discussion of the standard for construing the same provision of Proposition 13 by acknowledging that "The constitutionality of the requirement for an extraordinary majority is not in question." We then reviewed our reliance in *Amador*

---

[25] A subsequent opinion similarly reasoned, "There is no hint of invidious discrimination here. To the extent that the idea of classification is relevant at all to this kind of weighted voting, the voter classifies himself, and only after he votes. A myriad of factors may have gone into his decision to vote yea or nay." (*Matter of Contest of a Certain Sp. Election* (1982) 135 Ariz. 149 [659 P.2d 1294, 1298].)

on the holding of *Gordon* that because the extraordinary majority requirement did not discriminate against any identifiable class of voters, it did not violate the equal protection clause; and we declared, "We are, of course, bound by this conclusion." (31 Cal.3d at p. 203.)

More recently, the Court of Appeal relied on *Gordon* in upholding the two-thirds voter approval requirement of Proposition 13 as applied to a specific tax levied by a local district. (*Altadena Library Dist.* v. *Bloodgood* (1987) 192 Cal.App.3d 585 [237 Cal.Rptr. 649].) In that case a proposal to impose a special tax for library purposes obtained a majority but not the two-thirds voter approval required by Proposition 13. When the county controller refused to levy the tax because it did not meet that requirement, the district sought mandate to compel the levy. The trial court denied relief and the Court of Appeal affirmed. Rejecting a claim that as applied in that case the two-thirds voter approval requirement impaired the fundamental interest in education, the Court of Appeal reasoned that under *Amador* "we do not reach the question whether the supermajority requirement interferes with a fundamental interest. In equal protection analysis, the threshold question is whether the legislation under attack somehow discriminates against an identifiable class of persons. (*Gordon* v. *Lance* (1971) 403 U.S. 1, 4-5 [29 L.Ed.2d 273, 275-276, 91 S.Ct. 1889].) Only then do the courts ask the further question of whether this identifiable group is a suspect class or is being denied some fundamental interest, thus requiring the discrimination to be subjected to close scrutiny." (192 Cal.App.3d at p. 590.)

The Court of Appeal then held that the electors who vote on a tax measure do not constitute an "identifiable class" under *Gordon*: "The dilution of voting strength in the instant case . . . depends on which way a person voted in the election. True, if the voter cast a ballot *for* a tax increase as to a certain proposition his vote *would* be diluted by the supermajority requirement. Yet if he voted *against* a tax increase in another election even on that same ballot his vote would *not* be diluted. Indeed his voting power would be enhanced. Thus, the *very same person* could see his voting strength both diluted and enhanced *at the very same election* by a supermajority requirement. Accordingly, in the view of the Supreme Court the group whose votes are diluted as to one proposition on the ballot does not represent an 'identifiable' group of people." (192 Cal.App.3d at p. 591, italics in original.)

We conclude, contrary to petitioner's assertion, that the rule of *Gordon*, *supra*, 403 U.S. 1, is not limited to bond elections but applies equally to tax elections.

As its second ground of distinction petitioner seizes on a cautionary footnote at the end of the *Gordon* opinion in which the high court stated that

"We intimate no view on the constitutionality of a provision requiring unanimity or giving a veto power to a very small group." (403 U.S. at p. 8, fn. 6 [29 L.Ed.2d at p. 278].) Petitioner impliedly infers that the high court would hold such a provision unconstitutional, although its basis for doing so remains unstated. Petitioner then seeks to transform a one-third minority vote under Proposition 13—and, by extension, under section 53722—into "a veto power [of] a very small group" within the meaning of *Gordon*. The effort is unavailing.

Although the high court did not define the "very small group" it referred to in *Gordon*, it is clear that a group composed of one-third plus one of those voting in a tax election—the proportion needed to defeat a tax measure subject to a two-thirds voter approval requirement—is not the "very small group" that the *Gordon* court had in mind: "It is manifest . . . that a repository of veto power in a minority constituted by more than 1/3 of those voting (as in the case at bar) lies outside the concept imported by a 'very small group.' " (*Cohen* v. *Hoya* (Me. 1971) 280 A.2d 778, 782.)

This conclusion is first supported on the face of the *Gordon* opinion itself. After stating that its reasoning applied no less to a vote of the people than a vote of the legislature, the high court observed: "Indeed, we see no constitutional distinction between the 60% requirement in the present case and a state requirement that a given issue be approved by a majority of all *registered* voters." (403 U.S. at p. 7 [29 L.Ed.2d at p. 277], italics added, fn. deleted.) In a footnote at that point (p. 7, fn. 5 [29 L.Ed.2d at p. 275]) the court conceded that "In practice, the latter requirement would be far more burdensome than a 60% requirement." The court then pointed out that in the case before it approval by a majority of all registered voters "would have required the affirmative votes of over 79% of those voting." (*Ibid.*) This is far more, of course, than the two-thirds requirement at issue here.

In addition, "While Gordon v. Lance, supra, itself focussed upon a minority of more than 40%, other decisions of the Supreme Court of the United States rendered simultaneously with, and based upon, Gordon v. Lance show indisputably that veto power in a minority of more than 33-1/3% is constitutionally tolerable." (*Cohen* v. *Hoya, supra,* 280 A.2d 778, 782.) We have noted above two of those decisions: in *Mihaly* v. *Westbrook* (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224], the high court vacated and remanded for reconsideration in light of *Gordon* a case in which we had struck down a two-thirds voter approval requirement; in *Brenner* v. *School District of Kansas City, Missouri, supra,* 403 U.S. 913, the court affirmed on authority of *Gordon* a case in which the lower court had upheld a two-thirds

voter approval requirement. And on the same day, in *Bogert* v. *Kinzer, Clerk of City of Pocatello* (1971) 403 U.S. 914 [29 L.Ed.2d 691, 91 S.Ct. 2220], the court dismissed for want of substantial federal question, citing *Gordon*, an appeal in a case in which the lower court had likewise upheld a two-thirds voter approval requirement. We must conclude the high court would not have so ruled in these three companion cases to *Gordon* if it had intended a one-third minority to constitute a "very small group" within the meaning of the quoted *Gordon* footnote.

Petitioner seeks to avoid this conclusion by reducing the numbers still further. Although conceding that "the voters who constitute the majority may change from time to time on different tax issues," petitioner boldly asserts that "we know" that certain voters "always" vote against new taxes. From this premise petitioner reasons that when "a given percentage of the population will *always* vote with the minority, the voting power of the minority increases dramatically." By way of example, petitioner posits that "if 10% of the electorate always votes against new taxes, then those who oppose any given tax need obtain only 23.3% more votes." This means, petitioner concludes, that "23.3% of the voters have the same voting power as 66.6% of the voters."

The argument is ingenious but unpersuasive. Even if we assume arguendo that the group of 23.3 percent of the voters hypothesized by petitioner is in fact the "very small group" intended by the high court in *Gordon*, the fatal flaw in petitioner's argument remains its premise: we do *not* "know" that 10 percent—or any fixed percentage—of the electors "always" vote against new taxes. The record is silent on the point, and petitioner cites no source that we may judicially notice. Indeed, as petitioner frankly concedes, because of the secret ballot it is impossible ever to *know* that certain voters always vote against new taxes. Whatever political theorists may believe on this question, this court obviously cannot hold an initiative measure unconstitutional on the basis of such speculation. (*Legislature* v. *Eu, supra*, 54 Cal.3d 492, 501.)

■ By supplemental brief petitioner contends that the announced purpose of Proposition 62 was to give the electorate the right to vote on new local taxes; that Proposition 62 cannot constitutionally apply to charter cities, where nearly one-half of the population of California resides; and hence that Proposition 62 "should also be invalidated because it was unable to carry out its express purpose from the outset." The claim is without merit. Assuming arguendo that petitioner's minor premise is correct—i.e., that Proposition 62 is constitutionally inapplicable to charter cities, as the voters were told in the ballot materials—petitioner's conclusion still does not

follow. Petitioner invokes the rule of construction that when the main purpose of a statute is defeated by the unconstitutionality of part of the act, the whole act is invalid. (See 2 Sutherland, Statutory Construction (5th ed. 1993) § 44.07, p. 518.) That application of the law of severability, however, is irrelevant here. To deem Proposition 62 inapplicable to charter cities does not make it partially *unconstitutional*; it simply limits the reach of the measure by excluding such cities from its mandate. The Legislature—or the electorate, acting by initiative—has the power to adopt a partial remedy for a perceived evil, or to accomplish a partial reform of a larger field of law such as local taxation. To do so does not violate the due process clause: "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and it might be thought that the particular legislative measure was a rational way to correct it." (*Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 487-488 [99 L.Ed. 563, 572, 75 S.Ct. 461].) Nor does it violate the equal protection clause: "the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (*Id.* at p. 489 [99 L.Ed. at p. 574].) A statute is not invalid merely because it may fall short of accomplishing all that its drafters intended.[26]

■ We hold that section 53722 applies to petitioner and is constitutional. Accordingly, the challenged tax is invalid under section 53722, and we need not reach the question whether it is also invalid under Proposition 13.

The judgment of the Court of Appeal is affirmed.

Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**LUCAS, C. J.**—I respectfully dissent.

The majority in this case, and in another recent case (*Rossi* v. *Brown* (1995) 9 Cal.4th 688 [38 Cal.Rptr.2d 363, 889 P.2d 557]), has seriously undermined the ability of local government to finance sorely needed projects and improvements through local tax measures. In the past, the constitutional prohibition against using the referendum process to annul "tax levies" (Cal. Const., art. II, § 9, subd. (a)) assured that a proposed new tax could not be

---

[26]We therefore deny petitioner's request to take judicial notice of certain publications purporting to show the population of charter cities in California.

We do not reach (see fn. 6, *ante*) a contention that petitioner raised only at oral argument, i.e., that Proposition 62 denies localities a republican form of government. (U.S. Const., art. IV, § 4; see generally, *New York* v. *United States* (1992) 505 U.S. 144, 183-186 [120 L.Ed.2d 120, 155-157, 112 S.Ct. 2408].)

nullified by submitting the tax measure to the voters before it could take effect. In *Rossi*, however, this court allowed the opponents of a proposed San Francisco utility tax to annul the tax merely by labeling their petition an "initiative" rather than a "referendum," on the questionable theory that the petition acted "prospectively" and did not affect current fiscal year financing. (*Rossi* v. *Brown*, *supra*, 9 Cal.4th at p. 711; see *id.* at pp. 730-735 (dis. opn. of Mosk, J.).)

The present case continues this court's apparent trend of widely expanding the rights of local voters to reject proposed tax measures at the expense of local government, in contravention of the state Constitution. It is well established that the foregoing constitutional provision limiting the reach of the referendum process "amounts to a *declaration of policy* against subjecting [tax] legislation . . . to a vote of the people." (*Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836 [313 P.2d 545], italics added.) Here, the majority upholds a *statutory* initiative measure (Proposition 62) that purports to require a *two-thirds* vote of the electorate to approve special taxes sought to be assessed by local governmental entities or districts. The *policy* of the Constitution clearly forbids this procedure.

The majority responds that technically, the vote contemplated by Proposition 62 is not a referendum because it would occur *prior* to formal enactment of the tax measure rather than afterward. (See maj. opn., *ante*, at pp. 239-242.) But the effect is identical: a proposed tax measure is gutted by popular vote before the tax can be levied. This result is forbidden by constitutional *policy*, that is, by the spirit, if not the letter, of the state Constitution, as recognized by *Geiger* v. *Board of Supervisors*, *supra*, 48 Cal.2d at page 836.

By approving Proposition 62 and its supermajority vote requirement, the majority sanctions wholesale avoidance of the constitutional prohibition against tax referenda whenever special governmental taxes are involved. Because the "approval" vote is timed to take place before the tax measure is formally enacted, the measure may be disapproved by the voters (and by a *minority* of them) and rendered a nullity in the same manner as a constitutionally forbidden referendum.

I also believe that Proposition 62's supermajority vote requirement violates the constitutional provision calling for a simple *majority* vote on initiatives and referenda. (Cal. Const., art. II, § 10, subd. (a).) True, the measure does not expressly purport to contemplate a "referendum" or "initiative," but simply calls for a "voter approval." (See maj. opn., *ante*, at pp.

239-242.) Again, however, this distinction is overly technical, and contravenes the *policy* of the Constitution. "Approval" by the voters is a form of direct democracy tantamount to an initiative or referendum and is subject to the same constitutional restrictions and requirements.

Our decision in this case could have a devastating effect on local district financing of long-awaited projects and improvements. Given the general unpopularity of new tax measures (a factor that undoubtedly led to the initial adoption of the constitutional prohibition against tax referenda), it is likely that few, if any, proposed local tax measures will meet the required two-thirds voter approval.

Ironically, language in *Rossi* v. *Brown, supra,* 9 Cal.4th at page 703, fully supports my analysis. As the majority observed in that case: "The constitutional and charter exemptions from the referendum (statutes and ordinances calling elections, levying taxes, appropriating funds for current expenses, and other 'urgency' measures) are measures having special urgency, a delay in the implementation of which could disrupt essential governmental operations. County ordinances fixing the amount of money to be raised by taxes and those fixing the tax rate therefore go into effect immediately, while the effective date of other ordinances is delayed. (Elec. Code, §§ 9141-9143.) When a referendum petition qualifies prior to the effective date of a county ordinance, the ordinance is suspended pending reconsideration and repeal of the ordinance by the board of supervisors or submission of the measure to the voters at a regular or special election. The ordinance does not become effective unless and until a majority of the voters approves it at the referendum election. (Elec. Code, §§ 9144, 9145.) *Therefore, if a tax measure were subject to referendum, the county's ability to adopt a balanced budget and raise funds for current operating expenses through taxation would be delayed and might be impossible. As a result, the county would be unable to comply with the law or to provide essential services to residents of the county.*

"For that reason, when taxes levied to support essential governmental services arguably are involved in a referendum, the general rule requiring that referendum provisions be liberally construed to uphold the power is inapplicable. 'If essential governmental functions would be seriously impaired by the referendum process, the courts, in construing the applicable constitutional and statutory provisions, will assume that no such result was intended. [Citations.] One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the

administration of its fiscal powers and policies.' (*Geiger* v. *Board of Supervisors, supra,* 48 Cal.2d 839-840.)" (*Rossi* v. *Brown, supra,* 9 Cal.4th at p. 703, italics added.)

The foregoing reasoning is directly applicable to Proposition 62 and its requirement of voter preapproval of proposed new local tax measures needed to assure the continued functioning of government. In the present case, for example, the petition for review asserted that if the challenged tax is invalidated, extensive transportation and highway improvement projects will be abandoned, and over $350 million in matching state and federal funds will be lost. The inevitable effect of the operation of Proposition 62 will be to severely impair the functioning of local government.

Because I agree with his views regarding the unconstitutionality of Proposition 62, I adopt the following pertinent portion of Justice Wunderlich's well-reasoned dissenting opinion for the Court of Appeal in this case:

"In *City of Woodlake* v. *Logan* [(1991)] 230 Cal.App.3d 1058 [282 Cal.Rptr. 27] (*Woodlake*), the court held that the voter approval requirement in other sections of Proposition 62 was an unconstitutional referendum on local tax measures. (*Id.* at pp. 1061, 1064-1069.) [Fn. omitted.] The court's analysis and conclusion apply with equal force to the voter approval requirement in section 53722.

"The court explained that under the Constitution, the people may by referenda approve or reject state and local legislation except for, among other things, tax levies. [Fn. omitted.] (*Woodlake, supra,* 230 Cal.App.3d at p. 1062; see *Geiger* v. *Board of Supervisors*[, *supra,*] 48 Cal.2d 832, 836 [313 P.2d 545].) Thus, referenda may not be used to attack or nullify a tax ordinance of a city or county. (*Woodlake, supra,* 230 Cal.App.3d at p. 1063; [*City of*] *Westminster* [v. *County of Orange* (1988)] 204 Cal.App.3d [623,] 627 [251 Cal.Rptr. 511] [(*Westminster*)].)

"The court concluded that given the *constitutional* origin of the referendum power, it cannot be expanded *by statute* in a way that negates the express limitation on tax measures. (*Woodlake, supra,* 230 Cal.App.3d at p. 1067; *Westminster, supra,* 204 Cal.App.3d at p. 628.) ' "The listing of exceptions in the Constitution amounts to a declaration of policy against subjecting legislation concerning the excepted matters to a vote of the people. While [sections 9 and 11 of article II do] not expressly prohibit the Legislature from extending the right of referendum to include a county sales tax ordinance, any holding that such measures are subject to referendum would be contrary to this policy and against the clear implication of the

constitutional provision[s]. . . . It is obvious, however, that the authorization to adopt procedural regulations does not include the power to enact substantive measures which would extend the scope of the basic referendum right. There is no provision authorizing substantive changes, and we have concluded that it was not intended that the Legislature should have the power to extend or expand the scope of referendum." ' (*Woodlake, supra,* 230 Cal.App.3d at p. 1067, quoting *Geiger* v. *Board of Supervisors, supra,* 48 Cal.2d at pp. 836-837.)

"Finally, the court noted that one of the primary reasons tax levies for current expenses are exempted from the referendum or initiative power is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies. (*Woodlake, supra,* 230 Cal.App.3d at p. 1063.) Thus, '. . . the initiative and referendum power may not be used where the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power . . . . The power to tax for revenue purposes is probably the most vital and essential attribute of the government. Without such power it cannot function. [Citations.]' (*Id.* at p. 1068, internal quotation marks omitted.)

"[Real parties in interest, hereafter RPI] believe that *Woodlake* is wrong and therefore should not be followed. They claim that the voter approval requirement in Proposition 62 is not a referendum but an 'extension' of the people's initiative power under article II, section 8, of the California Constitution, which is not limited as to subject matter. [Fn. omitted.]

"In particular, RPI assert that while a referendum 'involves the *approval or rejection of an existing statute*[,]' an initiative involves the enactment of a statute. (Italics in original.) They note that under section 53722, a proposed tax does not become effective unless and until approved by the electorate. They argue that the voter approval requirement makes the voters an integral part of an *enactment* process shared with the legislative body rather than a referendum on an 'existing tax.' [Fn. omitted.] I am unpersuaded.

"The *Woodlake* court rejected RPI's claim that voter approval requirements merely reflect a sharing of the legislative process rather than a mandatory referendum. 'By definition the referendum and initiative process is a sharing of the power to legislate. It is a reservation by the people of the legislative power granted government. [Citation.] Creatively recharacterizing the power as a joint grant of authority does not change the elemental nature of the power itself. The referendum is the reservation of power to speak to matters upon which the legislative body has acted, i.e., the right to adopt or

reject any act or measure. The initiative is purer in form, but is also a sharing of this basic governmental power. It is the reservation of the power of the people to legislate directly without input from the legislative body. [Citation.]' (*Woodlake, supra,* 230 Cal.App.3d at p. 1065.) I agree with this analysis.

"Next, a referendum, contrary to RPI's view, does not operate on an 'existing statute,' if by that term RPI mean a statute that has become effective. Rather, a referendum operates 'to require voter ratification of measures passed but not yet in effect.' (*Westminster, supra,* 204 Cal.App.3d at p. 627; see *Whitmore* v. *Carr* (1934) 2 Cal.App.2d 590, 592 [38 P.2d 802].) Indeed, a referendum petition stays the effective date of a measure that has been enacted by the legislative body. (See Elec. Code, §§ 3753, 4051.) If the voters ratify the measure, then it becomes effective; if they reject it, then it does not. This process accurately describes the operation of section 53722: if a local government passes a tax measure, voters must ratify it to make it effective.

"RPI argue that the voter approval requirement cannot be a referendum because the statutory approval process is not initiated by a petition from the people. (See Cal. Const., art. II, § 9, subd. (b) [referenda may be proposed by petition from the people]; Elec. Code, § 3753.) This argument is meritless.

"Initiatives may also be proposed by petition from the people. (Cal. Const. art. II, § 8, subd. (b); Elec. Code, § 3701; see Cal. Const., art. II, § 10, subds. (d) and (e).) Moreover, the *Woodlake* court observed that Proposition 62 eliminates the need for a petition by requiring automatic referenda on tax measures. 'Nonetheless, the result is the same—approval or rejection by the voters of a legislative enactment which would otherwise become law.' (230 Cal.App.3d at pp. 1065-1066; see *id.* at p. 1068; cf. *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 777, fn. 16, 790, fn. 48, 793-794, fn. 53 [87 Cal.Rptr. 839, 471 P.2d 487] [referring to the supermajority voter approval requirement in different articles of the California Constitution as a 'mandatory referendum'], vacated and remanded on other grounds, *Mihaly et al.* v. *Westbrook et al.* (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224], cert. den. (1971) 403 U.S. 922 [29 L.Ed.2d 700, 91 S.Ct. 2225].) [Fn. omitted.]

"I next observe that if, as RPI claim, the supermajority voter approval requirement is derived from the people's initiative power, then the constitutionality of the requirement is questionable because it would conflict with article II, section 10, subdivision (a), of the California Constitution, which provides that initiative measures require only a *majority vote* to pass. [Fn.

omitted.] (See *Newport Beach Fire & Police Protective League* v. *City Council* (1961) 189 Cal.App.2d 17, 21-23 [10 Cal.Rptr. 919] [city charter provision requiring supermajority voter approval for adoption of initiative measure is unconstitutional].)

"RPI argue there would be no conflict because '*as to voter approval of local special taxes*, Proposition 62 restates and reinforces Article XIII A, Section 4. In this respect, Proposition 62 can be deemed to implement existing constitutional language.' (Italics in original.) This argument is irrelevant here. If Section 4 created an exception to the article II, section 10, subdivision (a), it would apply only to 'special taxes' levied by counties, cities, and 'special districts' within the meaning of Section 4. As I conclude above, [Santa Clara County Local Transportation Authority, hereafter SCCLTA] is not a 'special district.'

"Moreover, the definition of 'district' in section 53722 is much broader than the definition of 'special district' in Section 4. (See *Monterey* [*Penninsula Taxpayers Assn.* v. *County of Monterey* (1992)] 8 Cal.App.4th [1520,] 1535 [11 Cal.Rptr.2d 188].) Consequently, if, as *Woodlake* explains, the people may not enact a statute that eliminates the constitutional restriction on their referendum power (see *Geiger* v. *Board of Supervisors*, *supra*, 48 Cal.2d at pp. 836-837), they may not enact a statute that expands an exception to the constitutional provision allowing approval of initiatives by a simple majority.

"RPI claim that *Woodlake*'s view on the limits of legislation is erroneous, and they criticize its reliance on *Geiger* v. *Board of Supervisors*, *supra*, 48 Cal.2d at pages 836-837, quoted at [230 Cal.App.3d at page 1067]. RPI reiterate the criticism of *Geiger* by Justice George in his concurring opinion in *Rider* [v. *County of San Diego* (1991) 1 Cal.4th 1, 17-24 [2 Cal.Rptr.2d 490, 820 P.2d 1000], hereafter *Rider*]. There, he noted that the Constitution limited the *people*'s referendum power, exempting tax measures. However, '[i]n view of the well-established principles concerning the breadth of the legislative power retained by the Legislature (see, e.g., *Collins* v. *Riley* (1944) 24 Cal.2d 912, 915-916 . . . ; *Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 234 . . .), and the absence of any specific constitutional provision purporting to restrict the Legislature's authority to extend by statute the people's referendum power, I believe the broad dictum in *Geiger* is questionable.' (*Rider*, *supra*, 1 Cal.4th 1, 22 (conc. opn. of George, J.).) [Fn. omitted.]

"This criticism has no application here. Section 53722 was not an assertion of unrestricted legislative power by the Legislature but a popular

initiative. The pertinent question then is whether the *people* can nullify by *statutory initiative* the constitutional limitation on their referendum power. The court in *Woodlake* said no: 'It is also not permissible to achieve a prohibited purpose by disguising as an initiative a referendum addressing exempted matters. [Citations.] "A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process against a tax ordinance of a general law city . . . ." [Citation.] "That which the electors have no power to do directly, they obviously cannot do indirectly." [Citation.]' (*Woodlake, supra,* 230 Cal.App.3d at p. 1063; *Westminster, supra,* 204 Cal.App.3d at p. 628 [an initiative 'may not be used as a substitute for an impermissible referendum'].)

"The import of the court's language is not without ironic significance here. For while RPI claim that SCCLTA's tax is invalid because it was imposed by an agency created to circumvent a constitutional limitation on taxes, they ask us to uphold a statutory scheme designed to circumvent the constitutional limitation on referenda.

"Citing *Carlson v. Cory* (1983) 139 Cal.App.3d 724 [189 Cal.Rptr. 185], RPI claim that the people's initiative power is broad enough to do just that. However, the court in *Woodlake* rejected similar reliance on *Carlson.* 'The *Carlson* court's conclusion that initiatives are unrestricted and thus what cannot be done by referendum may be done by initiative has not been followed in other districts, and the decision has been limited in other cases. [Citations.] [¶] Even if *Carlson* is correctly decided, it is not controlling here. Proposition 62 does not repeal an existing statewide tax. It mandates referendums [*sic*] to validate *future* local tax ordinances. It thus effectively ties the hands of local government with respect to future budget planning. Under *Geiger* [v. *Board of Supervisors, supra,* 48 Cal.2d 832] this is constitutionally impermissible. If the proponents of Proposition 62 wish to accomplish this goal through use of referendum, they must achieve a constitutional amendment. Nothing else will suffice.' (*Woodlake, supra,* 230 Cal.App.3d at p. 1068, italics in original.) [Fn. omitted.] I agree.

"Finally, RPI suggest that the policy reasons justifying the limitation on referenda do not apply to Proposition 62 and therefore the voter approval requirement is not a referendum on taxes. Again, they rely on Justice George's concurrence in *Rider.* There, he explained that '. . . when a legislative body establishes tax levels in connection with the budget process, the governmental entity must be able to rely on the receipt of those tax revenues and cannot have the viability of such measures continually placed in doubt by the possibility that a referendum may be initiated by a relatively

small percentage of the electorate. [Citations.]' (*Rider, supra,* 1 Cal.4th at p. 23 (conc. opn. of George, J.).) He opined, however, that this reason does not apply to a voter-approval requirement because (1) such a requirement 'always will be known in advance,' (2) 'the local legislative body will be aware that it lacks the power to levy the tax *until* voter approval has been obtained,' and thus (3) 'the local entity will not include the anticipated tax revenue in its enacted budget until after the electorate has approved the tax.' (*Ibid.,* italics in original.)

"I consider the voter approval requirements in Proposition 62 to be far more disruptive to the budget process than would be the *possibility* of referenda initiated by petition, if constitutionally permissible. The Proposition 62 requirements are mandatory and *require* an election for every general and special tax a local government attempts to levy. Local government officials, not the electorate, are charged with responsibility for maintaining vital public services such as public transportation. To do so, for example, they must be able to maintain existing levels of funding and find and develop new sources of revenue not only to cover the ever-growing costs associated with current operations and the replacement of aging facilities and equipment but also to finance expansion to meet increasing public need and demand for transportation services. The voter approval requirements in Proposition 62 substantially interfere[] with the ability of government to perform this essential function.

"RPI claim that '[t]his is not disruption, but democracy.' Not so. In actual effect, the voter approval requirement in section 53722 mandates that a *minority* of the voters be given an opportunity to determine whether the government may collect a sales tax for transportation projects after the current sales tax terminates in 1995. As explained in [*Los Angeles County Transportation Com.* v.] *Richmond* [(1982) 31 Cal.3d 197, 202-208 (182 Cal.Rptr. 324, 643 P.2d 941)], this procedure is fundamentally *undemocratic.* This is especially so here because the majority of voters voted in favor of SCCLTA's sales tax extension.

"In light of my discussion, I conclude that section 53722 is unconstitutional and therefore does not invalidate SCCLTA's sales tax."

I agree with the foregoing reasoning. Accordingly, I dissent to the majority's holding invalidating the tax.

**WERDEGAR, J.,** Dissenting.—I join in most of the Chief Justice's dissenting opinion. In my view, however, neither the dissent nor the majority has correctly interpreted our recent opinion in *Rossi* v. *Brown* (1995) 9 Cal.4th 688 [38 Cal.Rptr.2d 363, 889 P.2d 557].

I would hold Government Code section 53722 (hereafter Proposition 62) unconstitutional as an effort to evade the constitutional rule that "statutes providing for tax levies" are not subject to referendum. (Cal. Const., art. II, § 9, subd. (a).) Proposition 62 has the same effect as a referendum, in that every new tax within its terms must be approved by the voters before taking effect. The majority concludes the submission of a proposed tax statute to the voters pursuant to Proposition 62 does not literally constitute a "referendum" because the vote takes place before the proposed statute has been enacted. I do not disagree with the majority on this point of semantics. The point is irrelevant, however, if the issue is whether Proposition 62 has the *effect* of evading the constitutional ban on tax referenda.

The majority attempts to find support for its conclusion in *Rossi* v. *Brown*, *supra*, 9 Cal.4th 688. In my view the attempt fails. At issue in *Rossi* was an initiative statute intended to repeal a tax ordinance that had already taken effect. Because the constitutional provisions defining the voters' power to change statutory law by initiative (Cal. Const., art. II, §§ 8, 11) do not exclude the subject of taxation, we held that statutes dealing with taxation were subject to repeal by initiative just like other statutes. *Rossi* did not concern an initiative, like that before us now, purporting to subject all new taxes proposed by a legislative body to the condition of voter preapproval.

*Myers* v. *City Council of Pismo Beach* (1966) 241 Cal.App.2d 237 [50 Cal.Rptr. 402 addressed the validity of an initiative more like the one at issue here. Voters of the City of Pismo Beach, concerned about the city council's proposal to enact a new room-occupancy tax, unsuccessfully attempted to place on the ballot an initiative that would have barred the council, but not the electorate, from enacting such a tax. The Court of Appeal held the initiative invalid on the ground the Legislature had delegated to the city council, to the exclusion of the electorate, the authority to deal with the tax at issue. The court also made the statement (*id.* at p. 243) described as "dictum" in *Rossi*: "A proposed initiative ordinance cannot be used as an indirect or backhanded technique to invoke the referendum process against a tax ordinance of a general law city, such as Pismo Beach."

This statement in *Myers* is dictum, as we said in *Rossi* (*supra*, 9 Cal.4th at p. 709), if read to mean the initiative power cannot be used to repeal a tax statute that has already taken effect. That was the situation in *Rossi*. However, if read to mean the electorate cannot claim the power to block future legislation on the subject of taxation, the statement in *Myers* was not dictum; it was part of the holding of the case. We did not in *Rossi* overrule *Myers*. Instead, we only rejected the misguided effort to apply its reasoning to the different situation that was before us in *Rossi*.

The majority, while acknowledging the facts of *Rossi* are distinguishable from those of the case at hand, asserts the reasoning of *Rossi* nevertheless applies. The part of *Rossi* to which the majority refers is that in which we attempted to explain why the drafters of the state Constitution permitted initiatives, but not referenda, on the subject of taxation. We wrote: " 'One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies.' " (*Rossi* v. *Brown, supra,* 9 Cal.4th at p. 703, quoting *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839-840 [313 P.2d 545].) The same reasoning, we thought, applied to local governments, "which could not accurately estimate income if tax ordinances were subject to referenda." (*Ibid.*)

Proposition 62, which functions like a referendum by subjecting to voter approval all new taxes proposed by a legislative body, creates exactly the problems the drafters of the Constitution anticipated and sought to avoid. The vote required by Proposition 62 interferes with the administration of local governments' fiscal powers just as a referendum would interfere: it postpones fiscal planning until the next election. The majority suggests the interference is less significant when the legislative body knows in advance that *every* proposed new tax will be subject to the voters' approval, rather than just those new taxes on which a referendum is called after qualifying for the ballot through signatures on a petition. (Maj. opn., *ante,* at pp. 245-246; see Cal. Const., art. II, § 9, subd. (b).) To the contrary, the interference caused by Proposition 62 is more significant. Indeed, it is total and automatic. Unlike the rules governing referenda, Proposition 62 requires a vote on every new tax, even if there would not exist sufficient interest to place a particular tax on the ballot.

The court in *Rossi,* a case about the repeal of an existing tax, did not address or purport to approve a statute with the far-reaching effect of Proposition 62. Misreading *Rossi,* the majority extends its holding beyond the facts of the case, thereby giving the electorate the equivalent of a power denied to them in the Constitution. For that reason I dissent.

Petitioner's application for a rehearing was denied December 14, 1995, and the opinion was modified to read as printed above. Lucas, C. J., and Werdegar, J., were of the opinion that the application should be granted.

APPENDIX

# Text of Proposed Law

This initiative measure is submitted to the people in accordance with the provisions of Article II, Section 8 of the Constitution.

This initiative measure adds sections to the Government Code; therefore, the new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

Article 3.7 is hereby added to Chapter 4 (Financial Affairs) of Part 1 (Powers and Duties Common to Cities, Counties and other agencies) of Div. 2 (Cities, Counties and other Agencies) of Title 5 (Local Agencies) of the Government Code, commencing with Section 53720.

*ARTICLE 3.7*

*VOTER APPROVAL OF TAXES*

*53720. DEFINITIONS.*

*As used in this Article:*

*(a) "local government" means any county, city, city and county, including a chartered city or county, or any public or municipal corporation; and,*

*(b) "district" means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries.*

*53721. All taxes are either special taxes or general taxes. General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes.*

*53722. No local government or district may impose any special tax unless and until such special tax is submitted to the electorate of the local government, or district and approved by a two-thirds vote of the voters voting in an election on the issue.*

*53723. No local government, or district, whether or not authorized to levy a property tax, may impose any general tax unless and until such general tax is submitted to the electorate of the local government, or district and approved by a majority vote of the voters voting in an election on the issue.*

*53724. (a) A tax subject to the vote requirements prescribed by Section 53722 or*

*Section 53723 shall be proposed by an ordinance or resolution of the legislative body of the local government or district. The ordinance or resolution proposing such tax shall include the type of tax and rate of tax to be levied, the method of collection, the date upon which an election shall be held on the issue, and, if a special tax, the purpose or service for which its imposition is sought.*

*(b) No tax subject to the vote requirement prescribed by Section 53723 shall be presented at an election unless the ordinance or resolution proposing such tax is approved by a two-thirds vote of all members of the legislative body of the local government or district.*

*(c) Except as provided in subdivision (d), the election on any tax proposed pursuant to this Article shall be consolidated with a statewide primary election, a statewide general election, or a regularly scheduled local election at which all of the electors of the local government or district are entitled to vote.*

*(d) Notwithstanding subdivision (c), the legislative body of the local government or district may provide that the election on any tax proposed pursuant to this Article shall be held at any date otherwise permitted by law. The local government or district shall bear the cost of any election held pursuant to this subdivision. An election held pursuant to this subdivision shall be deemed at the request of the local government or district calling such election, and shall not be deemed a state mandate.*

*(e) The revenues from any special tax shall be used only for the purpose or service for which it was imposed, and for no other purpose whatsoever.*

*53725. (a) Except as permitted in Section 1 of Article XIII A of the California Constitution, no local government or district may impose any ad valorem taxes on real property. No local government or district may impose any transaction tax or sales tax on the sale of real property within the city, county or district.*

*(b) Taxes permitted by Subdivision (b) of Section 1 of Article XIII A of the California Constitution shall not be subject to the vote requirements prescribed by this Article.*

53726. Except as set forth in Section 53727, this Article shall not be construed to repeal or affect any statute enacted prior to August 1, 1985 which authorizes the imposition of a special tax.

53727. (a) Neither this Article, nor Article XIII A of the California Constitution, nor Article 3.5 of Division 1 of Title 5 of the Government Code (commencing with Section 50075) shall be construed to authorize any local government or district to impose any general or special tax which it is not otherwise authorized to impose; provided, however, that any special tax imposed pursuant to Article 3.5 of Division 1 of Title 5 of the Government Code prior to August 1, 1985 shall not be affected by this section.

(b) Any tax imposed by any local government or district on or after August 1, 1985, and prior to the effective date of this Article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of imposition, which election shall be held within two years of the effective date of this Article. Any local government or district which fails to seek or obtain such majority approval shall cease to impose such tax on and after November 15, 1988.

53728. If any local government or district imposes any tax without complying with the requirements of this Article, or in excess of its authority as clarified by Section 53727, whether or not any provision of Section 53727 is held not applicable to such jurisdiction, the amount of property tax revenue allocated to the jurisdiction pursuant to Chapter 6 of part 0.5 of Division 1 of the Revenue and Taxation Code (commencing with Section 95) shall be reduced by one dollar ($1.00) for each one dollar ($1.00) of revenue attributable to such tax for each year that the tax is collected. Nothing in this section shall impair the right of any citizen or taxpayer to maintain any action to invalidate any tax imposed in violation of this Article.

53729. This Article may only be amended by vote of the electorate of the State of California.

53730. If any provision of this Article, or the application thereof to any person, organization, local government, district, or circumstance is held invalid or unconstitutional, the provision to other persons, organizations, local governments, districts, or circumstances shall not be affected thereby but shall remain in full force and effect.